Mercedes **MONTALVO–HUERTAS**, etc., et al., Plaintiffs, Appellees,

v.

Hector **RIVERA–CRUZ**, etc., et al., Defendants, Appellants.

No. 89–1252.

United States Court of Appeals, First Circuit.

Heard June 8, 1989.

Decided Sept. 20, 1989.

Luis N. Blanco, Federal Litigation Div., Dept. of Justice, with whom Hon. Rafael Ortiz Carrion, Sol. Gen., and Norma Cotti Cruz, Deputy Sol. Gen., Ponce, P.R., were on brief for defendants, appellants.

Daniel R. Dominguez with whom Enrique M. Bray, Carmen Irizarry Dominguez, Dominguez & Totti and Luis F. Padilla, Hato Rey, P.R., were on brief for plaintiffs, appellees.

* Of the District of Massachusetts, sitting by designation.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

SELYA, Circuit Judge.

We are called upon today to determine the constitutionality of P.R. Laws Ann. tit. 33, §§ 2201–05 (1983 & Supp.1987) (the Closing Law), a much-amended statute which limits the transaction of business in Puerto Rico on Sundays, holidays, and after stipulated hours. Discerning, as we do, a rational legislative basis for the statute as it stands, we rule that the Closing Law does not deprive appellees of due process or equal protection under the federal Constitution.

## I. LEGISLATIVE BACKGROUND

As originally enacted, the Closing Law barred commercial and industrial establishments from opening on Sundays. Penal Code of Puerto Rico, §§ 553–56 (1902). It exempted a relatively select group of businesses, including public marketplaces, pharmacies, hotels, restaurants, utilities, and places devoted exclusively to amusement (such as theatres). The statute also made an exception for "works of emergency, necessary to prevent unusual and serious financial loss." *Id.*, § 553. Over the years, the Puerto Rico legislature passed a plethora of amendments to the Closing Law, exempting many additional activities.[1] In its present incarnation, the Closing Law permits industry to function unrestrained, but prohibits non-exempt commercial establishments from operating on Sundays, certain legal holidays, and after 9:00 p.m. (10:00 p.m. on a few designated dates).

The list of exemptions has grown like the proverbial beanstalk; it now reaches, for example, (1) printeries, newspaper enterprises, garages, filling stations, public marketplaces (and stands for the sale of local produce and vegetables); (2) restaurants, cafes, hotels, inns, refreshment stands, confectioneries, pastry stores, and newsstand-

1. The district court tabulated twenty-four separate amendments. *Montalvo Huertas v. Rivera Cruz,* No. 89–0112, slip op. at 5, 1989 WL 46713 (D.P.R. Feb. 16, 1989).

type operations; (3) casinos and billiard rooms; (4) slaughterhouses, meat stands, dairies, ice and milk depots, livery stables, funeral homes, piers and docks; (5) public and quasi-public utilities; (6) theatres, race-tracks, and other places devoted exclusively to amusement or charitable purposes; (7) pharmacies; (8) all commercial establishments at airports; (9) all commercial or service establishments operating within hotels (so long as the business constitutes part of the facilities offered to guests); (10) emergency work, defined as in the original Closing Law; (11) banks; (12) laundromats; (13) those commercial establishments which, because of the nature of their main activity, necessitate continuous operation; (14) rural barbershops; (15) owner-operated businesses; and (16) concerns located in the Old San Juan tourist zone and devoted to tourist interest. *See* P.R. Laws Ann. tit. 33, §§ 2201–05 (1983 & Supp.1987).

## II. PRIOR JUDICIAL PROCEEDINGS

In the past decade, the Closing Law has been repeatedly challenged in the Commonwealth's courts. We need remark only the most recent of these efforts. In *Pueblo Int'l, Inc. v. Rivera Cruz*, 88 J.T.S. 145 (1988), *translated and reprinted in* Record Appendix (R.A.) at 154–323,[2] a supermarket chain intent on, but barred from, opening on Sundays, brought a class action in the Commonwealth courts on its own behalf and on behalf of all similarly situated retailers. The challenge was bottomed on due process and equal protection guarantees of both the federal and Commonwealth constitutions. Six individual plaintiffs, all part-time employees of Pueblo who claimed to have been denied work by virtue of the Closing Law, joined in the suit.

**2.** We have been furnished official English translations of the opinions in the *Pueblo Int'l* litigation. For ease in reference, we cite to the translations as they appear in the record appendix, *e.g.*, "Translation at ——."

**3.** Notably, the division seems to have resulted from differing conclusions as to the degree of scrutiny to be applied. The justices who voted to uphold the law, while writing separate opinions, all believed minimum scrutiny—a rational basis test—to be appropriate. *See Pueblo Int'l,*

After preliminary skirmishing now not material, the superior court applied an intermediate standard of review, declared the Closing Law violative of the Puerto Rico Constitution, and issued an injunction. *Pueblo Int'l, Inc. v. Rivera Cruz*, Civ.No. 86–2716 (Super.Ct. San Juan Part June 25, 1986). The ensuing appeal was heard before six justices of the Supreme Court of Puerto Rico, who divided equally on the question of the Closing Law's constitutionality.[3] Because Article V of the Commonwealth Constitution ordains that no law shall be declared unconstitutional except by a majority of the total number of justices comprising the Puerto Rico Supreme Court, the superior court decision was reversed and the injunction vacated. *Pueblo Int'l,* Translation at 156 (Judgment of the Court).

Shortly thereafter, the instant action was filed in the United States District Court for the District of Puerto Rico against three ranking Commonwealth law-enforcement officials (appellants before us). The prime mover was Puerto Rico 7, Inc. (PR–7), a firm which, since 1987, had operated several convenience stores around the clock and on Sundays. There were also numerous other plaintiffs and intervening plaintiffs. Some of these individuals were employed by PR–7 and some by Pueblo; all claimed to have lost work as a result of the Closing Law's threatened enforcement. The plaintiffs invoked 42 U.S.C. § 1983 and alleged due process and equal protection violations under the fourteenth amendment, asserting among other things that there was no rational basis upon which the Closing Law could be sustained. The jagged lines drawn between covered and exempted businesses were, in plaintiffs' view, altogether arbitrary and unreasonable.

Translation at 177–84 (opinion of Justice Negron Garcia); *id.* at 233 (opinion of Justice Rebollo Lopez); *id.* at 249–51 (opinion of Justice Hernandez Denton). The remaining justices did not dispute that there was a rational basis for the Closing Law, but voted to strike it down on the basis of heightened "intermediate" scrutiny. *See, e.g., id.* at 286–307 (opinion of Chief Justice Pons Nunez, with whom Justices Ortiz and Alonso Alonso joined).

The district court granted a temporary restraining order; advanced the case on the docket; merged preliminary injunction with the merits, *see* Fed.R.Civ.P. 65(a)(2); held an evidentiary hearing; and permanently enjoined enforcement of the Closing Law. *Montalvo Huertas v. Rivera Cruz*, No. 89–0112 (D.P.R. Feb. 16, 1989) (D.Ct.Op.). After resolving a variety of preliminary matters against the defendants, the court concluded that there was no rational relationship between the Closing Law and its professed legislative purpose (providing a uniform day of rest). *Id.* at 33–38. This appeal followed.

## III. THRESHOLD MATTERS

Short of the merits, defendants assert that the court below erred in entertaining, and presuming to pass upon, plaintiffs' complaint. The assertion has two major facets. Neither withstands analysis.

### A. *Res Judicata.*

■ Appellants argue that the doctrine of res judicata bars PR–7, at least,[4] from relitigating issues already decided in the Commonwealth courts. Pointing out that *Pueblo Int'l* was a class action, appellants maintain that PR–7 was a member of the plaintiff class, and bound; or if PR–7 was not within the class, that ties between PR–7 and class members warrant application of res judicata.[5] We find both theses untenable.

Local law applies in deciding the res judicata effect of a local judgment in a federal court. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466–67, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411–15, 66 L.Ed.2d 308 (1980); *Fiumara v. Fireman's Fund Ins. Cos.*, 746 F.2d 87, 91

(1st Cir.1984). In Puerto Rico, the pertinent statutory provision states:

> In order that the presumption of the res adjudicata may be valid in another suit, it is necessary that, between the case decided by the sentence and that in which the same is invoked, there be the most perfect identity between the things, causes, and persons of the litigants, and their capacity as such.
>
> \*   \*   \*   \*   \*   \*
>
> It is understood that there is identity of persons whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of prestations among those having a right to demand them, or the obligation to satisfy the same.

P.R. Laws Ann. tit. 31, § 3343 (1968). Here, our principal focus is on the identity between the persons of the litigants (or, more precisely, the lack of any).

1. *Class Membership.* Contrary to defendants' exhortations, we find that PR–7 was not a member of the *Pueblo Int'l* plaintiff class. We explain briefly.

The class certified in the superior court was described in the court's judgment as "composed of all the retail business establishments in Puerto Rico *until now* covered and not exempt from [the Closing Law] that, for whatever reason, wish to open on Sundays and holidays...." [Emphasis supplied]. The unvarnished import of this language is to limit the decree, and the class, to businesses then wearing the Closing Law's yoke. The superior court judgment was entered on June 25, 1986. At that time, PR–7 was but a gleam in its founders' eyes; it had not yet been incorpo-

---

**4.** The individual plaintiffs who joined with PR–7 in bringing this action did not participate in *Pueblo Int'l*, and appellants do not contend that they are precluded from litigating the constitutionality of the Closing Law. Nevertheless, questions as to the employees' standing, *see infra* Part III(B), make it potentially important to determine whether res judicata bars the corporate plaintiff from joining in the prosecution of this litigation.

**5.** We recognize, of course, the distinction between res judicata (claim preclusion) and collateral estoppel (issue preclusion). *See e.g., Fiumara v. Fireman's Fund Ins. Cos.*, 746 F.2d 87, 90 n. 1 (1st Cir.1984) (discussing difference). In this case as in *Fiumara*, "the splitting of such fine hairs would be meaningless." *Id.* Thus, we use the term "res judicata" herein to encompass both concepts.

rated and was not then doing business.[6] Appellants strain to interpret the language of the judgment differently, suggesting that the class included all current and future establishments to which the provisions of the Closing Law on the books in 1986 could conceivably apply. The "until now" language, they insist, was meant to modify the scope of the statute's coverage, not the phrase "retail business establishments." The district court disagreed, D.Ct.Op. at 15, and so do we.

The proposition seems sufficiently self-evident that we need not wax longiloquent in its interest. For one thing, construing the adverb phrase to exclude businesses not yet in operation accommodates plain meaning; it gives vent to the natural and most logical construction of the words. For another, that plain-meaning interpretation comports with a familiar canon of construction, the rule of the last antecedent. *See, e.g., United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751 (1st Cir.1985) (under the rule, qualifying phrases are usually to be applied to the words or phrase immediately preceding); *Rhode Island Chapter of the National Women's Political Caucus, Inc. v. Rhode Island Lottery Comm'n,* 609 F.Supp. 1403, 1408–09 (D.R.I.1985) (listing cases applying rule). Lastly, the theory underlying res judicata is that "[i]dentity of parties and interest is required so that a party's rights and obligations will not be determined without [its] knowledge or an opportunity for participation." *Futura Development Corp. v. Centex Corp.,* 761 F.2d 33, 43 (1st Cir.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 121 (1985). While it is sometimes permissible to certify future parties as members of a class, *see* 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 23.40[3] & n. 16 (1987) (collecting cases), we decline to twist inhospitable language to include future parties who had no opportunity to be heard. We are particularly reluctant to do so given Rule 20.3(c) of the Puerto Rico Rules of Civil Procedure, which expressly requires judgments in class actions to "include and describe those whom the court finds to be members of the class." By no stretch of the most vivid imagination can the superior court be said to have "include[d] and describe[d]" embryonic companies, like PR–7, as class members to whom its judgment applied.

2. *Derivative Bonding.* Appellants attempt to convince us that res judicata still attaches even if, as we have now concluded, PR–7 was not within the *Pueblo Int'l* class. We remain unpersuaded.

Appellants' contention that PR–7 and its coplaintiffs are the "legal representatives" of the *Pueblo Int'l* plaintiffs or "jointly bound" with them, *see* P.R. Laws Ann. tit. 31, § 3343 (quoted *supra* at 974), is jejune. Under Commonwealth law, application of the quoted language requires that some single actor play a meaningful role in both the earlier and later suits, whether or not behind the scenes. *See, e.g., Pol Sella v. Lugo Christian,* 107 P.R. Dec. 540 (1978) (res judicata applies when same person is real party in interest vis-a-vis both suits); *Heirs of Zayas Berrios v. Berrios,* 90 P.R.R. 537 (1964) (res judicata applies where same parties actually controlled conduct of both suits). Nothing in the record suggests that PR–7 was affiliated with, or a successor in interest to, any member of the *Pueblo Int'l* class. There is no predicate for a founded claim that PR–7 was a party in interest or a controlling force in the *Pueblo Int'l* litigation. Indeed, because the firm had not been formed when the superior court judgment eventuated, it could have played no such role.

Appellants also tell us that there is a sufficient community of interest between plaintiffs in the two cases to justify use of res judicata. But, we fail to see how this is so. Certainly, the Commonwealth has directed us to no authority which supports the proposition. To invoke res judicata, it is not enough that PR–7's concerns—the perceived unfairness of the Closing Law and its deleterious effect on retail business—mirrored those which likely impelled Pueblo to start suit in superior court. *See*

---

**6.** PR–7 was incorporated in early 1987 and opened its maiden store in September of that year.

*A & P General Contractors, Inc. v. Asociacion Cana, Inc.*, 110 P.R.Dec. 753 (1981) (although cause of action the same, fact that parties are not identical forestalls imposition of res judicata). That PR–7's aims are much the same as those of an earlier, unrelated litigant cannot rob the firm of its day in court.

We conclude that prosecution of the instant action was not barred by res judicata.

## B. *Standing.*

■ Appellants also claim that plaintiffs lacked standing to sue. At least as to PR–7, they are wrong. PR–7 began operating in Puerto Rico during the period when the *Pueblo Int'l* injunction was in effect. After the injunction was lifted, defendants "again set about to enforce the Closing Law." D.Ct.Op. at 12. At that point, PR–7—which kept its stores in operation on days, and during hours, prohibited by the Closing Law—was staring down the barrel of a howitzer.

It is apodictic that a party has standing to contest governmental action if it can demonstrate injury in fact. PR–7 met all the criteria. It was unquestionably confronted by "threatened injury as a result of the putatively illegal conduct of the defendant[s]." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The threat—and consequently, the harm—was imminent and real. The injury could "be traced to the challenged [governmental] action," and was "likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758, quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924,

1925, 48 L.Ed.2d 450 (1976). PR–7, then, was no mere quidnunc; the corporation undeniably had standing to sue.

That determination renders it unnecessary to probe too deeply into the individual plaintiffs' standing. To all intents and purposes, PR–7 and the employee groups are similarly affected by, and possess similar concerns anent, the Closing Law. Where coplaintiffs have a shared stake in the litigation—close identity of interests and a joint objective—the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs' standing. *See Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 562 & n. 9, 50 L.Ed.2d 450 (1977).

## IV. THE MERITS

Any consideration of the Closing Law's constitutionality must start with establishing the appropriate level of judicial scrutiny. We begin in that fashion, then proceed to explicate our understanding of the applicable standard, and ultimately address the specifics of plaintiffs' challenge.[7]

### A. *Level of Scrutiny.*

■ As a general rule, federal courts, respecting the right of local self-determination, employ the prophylaxis of the equal protection clause only to ensure the existence of some rational relationship between a challenged statute and the legitimate ends of local government. *See, e.g., Kadrmas v. Dickinson Public Schools*, ── U.S. ──, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988). There are, of course, exceptions. If legislative distinctions are based on a "suspect" classification, *e.g.*, race or natural origin, or disturb some "fundamental"

---

**7.** Plaintiffs' claim in this case was premised originally upon equal protection and due process grounds. The district court addressed the substantive due process claim and concluded that "minimum rationality is the appropriate standard of review." D.Ct.Op. at 27. Because the same standard applies under the equal protection clause, *see* text *infra*, the invocation of

due process adds no new dimension to the case. Apparently recognizing that the type and kind of scrutiny applied, and the result, would be no different on either theory, the parties have briefed their positions exclusively in the idiom of equal protection. Accordingly, we deem it unnecessary to address due process as a separate theorem.

right, then the law must pass strict scrutiny, *Kadrmas,* 108 S.Ct. at 2487, and the state must show a compelling interest incapable of being served by less intrusive means. *See San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 16–17, 93 S.Ct. 1278, 1287–88, 36 L.Ed.2d 16 (1973); *McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). By the same token, if the challenged classification is based on sex or illegitimacy, *Kadrmas,* 108 S.Ct. at 2487, or embodies a collocation of "unique circumstances," *id.* at 2488, quoting *Plyler v. Doe,* 457 U.S. 202, 239, 102 S.Ct. 2382, 2406, 72 L.Ed.2d 786 (1982) (Powell, J., concurring), the Court has sometimes applied a heightened level of scrutiny, which falls somewhere between strict scrutiny and the rational basis standard. *See Clark v. Jeter,* 486 U.S. 456, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

We do not believe that any elevated level of scrutiny is implicated here. As a matter of federal constitutional law, the Commonwealth need demonstrate only a rational basis for the Closing Law in order to defeat an equal protection challenge. *See Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981) ("Social and economic legislation that does not employ suspect classifications or impinge on fundamental rights must be upheld ... when the legislative means are rationally related to a legitimate government purpose."); *see also City of Dallas v. Stanglin,* —— U.S. ——, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989); *Kadrmas,* 108 S.Ct. at 2489; *Tenoco Oil Co. v. Dept. of Consumer Affairs,* 876 F.2d 1013, 1021 (1st Cir. 1989). "[I]n the local economic sphere, it is only the invidious discrimination, the whol-

ly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam).

Appellees seem to concede, albeit grudgingly, that the Closing Law must only survive rationality review.[8] But, they point to a pair of factors which, in their view, put a special gloss on the standard. We consider neither factor sufficient to the task.

Appellees argue initially for a static delineation of the nexus between legislation and impetus, contending that the Closing Law can only survive if it bears a rational relationship to the actual purpose behind its *original* enactment in 1902. Plaintiffs identify this purpose as being "to provide a day of rest for all Puerto Rican workers at a time when there was no other remedial labor legislation available." Appellees' Brief at 51. Because that void has long since been filled by the enactment of numerous laws protective of workers' rights, appellees claim the Closing Law is no longer rationally related to its seminal purpose and must be struck down.

This argument is flawed in at least two respects. In the first place, evaluating the continued need for, and suitability of, legislation of this genre is exactly the kind of policy judgment that the rational basis test was designed to preclude. *See, e.g., Ferguson v. Skrupa,* 372 U.S. 726, 731, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963) (court should not "sit as a 'superlegislature to weigh the wisdom of legislation'") (citations omitted). In the second place, by suggesting that a statute must be rationally related to the purpose which actually motivated its enactment, appellees are in

---

**8.** Appellees argued below for a higher level of scrutiny, constructing the following syllogism: the Closing Law serves to differentiate unfairly between occupations and work opportunities; thus, it denies non-exempt persons the right to work on Sunday and rest on another day; ergo, the ensuing deprivation, if not tantamount to the deprivation of a fundamental right, encumbers an important right, thus requiring some heightened degree of oversight. It is unclear whether plaintiffs continue to hawk this proposition. In any event, the suggestion is meritless:

the freedom to engage in a particular occupation has never been recognized as a "special" right for equal protection purposes. Government can impose reasonable conditions on the conduct of business and on working arrangements. Unless other factors intrude (say, race or ethnicity), state regulation of such activities must be analyzed under the rational basis test. *See New Motor Vehicle Bd. of California v. Orrin W. Fox Co.,* 439 U.S. 96, 107, 99 S.Ct. 403, 410, 58 L.Ed.2d 361 (1978).

effect applying a heightened level of scrutiny. *See* L. Tribe, *American Constitutional Law,* § 16–3 at 1445–46 n. 21 (2d ed. 1988). Under the rational basis test, duly enacted socioeconomic legislation should be upheld so long as *any* set of facts could suffice to establish a rational relationship between the law and the government's legitimate objectives. The Constitution gives us no right to put Puerto Rico's legislature on so short a leash as appellees have fashioned.

Next, plaintiffs attempt to persuade us that the Court has tightened the screws of the rational basis framework, bringing into vogue what one commentator has called "[o]ld equal protection with new bite...." Gunther, *Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L. Rev. 1, 22 (1972). Plaintiffs base this contention on the fact that the Court, while engaged in rationality review, has from time to time undone local legislation of a social or economic nature. *See, e.g., Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Yet, it strains credulity to read too much into these occasional decisions. We agree with Professor Tribe that:

> This sporadic move away from near-absolute deference to legislative judgment seems to be a judicial response to statutes creating distinctions among classes of residents based on factors the Court evidently regards as in some sense "suspect" but appears unwilling to label as such.

L. Tribe, *supra* § 16–3 at 1445.[9]

Jurisprudence is not an exact science and many of the cases cited by appellees are fact-specific. While admitting the difficulty of weaving a simple pattern which might suffice to explain all of the decided cases in a logical and consistent way, we believe none of the Court's recent decisions have signalled the demise (or even the loss of health) of the traditionally deferential rational basis test in cases, like this one, which do not involve quasi-suspect classifications or important personal rights. *See, e.g., Stanglin,* 109 S.Ct. at 1596 (upholding age restriction for dance halls because "city could properly conclude that limiting dance hall contacts between juveniles and adults would make less likely illicit or undesirable juvenile involvement with alcohol, illegal drugs, and promiscuous sex"); *Kadrmas,* 108 S.Ct. at 2491 (upholding statute authorizing nonreorganized school districts to charge user fees for bus transportation since "legislature could ... rationally conclude that those districts should have the option of imposing user fees on those who take advantage of the service they are offered"). The Closing Law is about people and business; its categorizations, although Delphic in spots, do not cross the line into the realm of suspect, or even quasi-suspect, classifications. Accordingly, we must subject this legislation to rationality review, consistent with the Court's traditional interpretation of the rational basis standard.

Our formulation of that standard is not in doubt. As we quite recently explained in the due process milieu, a statute will pass such scrutiny "if any reasonably conceivable set of facts could establish a rational relationship between [it] and the ... government's legitimate ends." *Tenoco,* 876 F.2d at 1021; *see also Williamson v. Lee Optical Co.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955); *United States v. Carolene Products,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938). Moreover, the Closing Law, like other social or economic legislation, "carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel,* 452

---

9. *See, e.g., Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259. (Court expressed concern that law rested "on an irrational prejudice against the mentally retarded"); *Zobel,* 457 U.S. at 59, 102 S.Ct. at 2312 (Court remarks invidious creation of "fixed, permanent distinctions between ... classes of concededly bona fide residents, based on how long they have been in the State"); *Moreno,* 413 U.S. at 534, 93 S.Ct. at 2826 (law evidenced "a bare congressional desire to harm a politically unpopular group").

U.S. at 331–32, 101 S.Ct. at 2386–87. It follows, then, that plaintiffs, as challengers of the law's rationality, have the devoir of persuasion "that the legislative facts upon which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979); *see also Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (same; discussing substantive due process challenge).

### B. *The McGowan Trilogy.*

In measuring the Closing Law against this agreeable yardstick, we start with the *McGowan* trilogy—three cases decided in the same term by the Court. *See McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Two Guys from Harrison–Allentown, Inc. v. McGinley,* 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); *Gallagher v. Crown Kosher Super Market,* 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961). In each of these cases, the Court applied the rational basis test to uphold Sunday closing laws.

In *McGowan,* the Court considered a Maryland statute which, like the Closing Law, was penal in nature and subject to a "myriad of exceptions." *Id.* 366 U.S. at 424, 81 S.Ct. at 1104. The purpose of the Maryland law was essentially the same as that attributed to the Closing Law, viz., establishing "Sunday as a day of rest." *Id.* at 425 n. 2, 81 S.Ct. at 1105 n. 2. As appellees do here, appellants in *McGowan* contended that the statute's many exceptions rendered it arbitrary and irrational. *Id.* at 425, 81 S.Ct. at 1104. The Court first announced the rule of decision, stating that the statute could be deemed unconstitutional only if its taxonomy "rests on grounds wholly irrelevant to the achievement of the State's objective." *Id.* Put another way, the law could not be set aside "if any state of facts reasonably may be conceived to justify" the classifications employed. *Id.* at 426, 81 S.Ct. at 1105.

Maryland's closing law, the Court found, easily satisfied this deferential benchmark.

With respect to statutory exceptions for certain merchandise, "a legislature could reasonably find that [their] Sunday sale ... was necessary either for the health of the populace or for the enhancement of the recreational atmosphere of the day," or that "local tradition and custom might ... rationally call for this ... treatment." *Id.* As to exceptions which the legislature had engrafted for merchants in certain counties, the Court held "territorial uniformity" not to be "a constitutional prerequisite," *id.* at 427, 81 S.Ct. at 1106; drawing distinctions between different geographic areas was thought, generally, to come within the domain of legislative discretion. *Id.* Finally, the Court upheld portions of the statute which allowed some businesses to sell particular goods on Sunday, while barring other businesses from selling the same goods on the same day. *Id.* at 427–28, 81 S.Ct. at 1105–06. The state legislature could reasonably have decided that certain commodities "necessary for the health and recreation of [Maryland's] citizens, should only be sold on Sunday by those vendors at the locations where the commodities are most likely to be immediately put to use." *Id.* at 428, 81 S.Ct. at 1106. The Court further reasoned that the size of the businesses might have been another appropriate factor in the legislature's line-drawing. *Id.*

In *Gallagher,* the Court upheld a Massachusetts closing law against similar attacks. There, the district court had invalidated a statute which it described as an "unbelievable hodgepodge." *Gallagher,* 366 U.S. at 622, 81 S.Ct. at 1125. The Court reversed, observing that: "A classification having some reasonable basis does not offend against [the equal protection] clause merely because it is not made with mathematical nicety or because in practice it results in some inequality." *Id.* at 624, 81 S.Ct. at 1126, quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). *Two Guys* involved a Pennsylvania statute which, *inter alia,* provided much heavier penalties for the Sunday sale of twenty

specified commodities than for other (somewhat similar) goods. The Court discerned no equal protection violation, finding it to be "within the power of the legislature to have concluded that [certain] businesses were particularly disrupting the intended atmosphere of the day." *Two Guys*, 366 U.S. at 591, 81 S.Ct. at 1140.

Some fifteen years later, the Court employed much the same analysis in *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam). In *Dukes*, a municipal ordinance prohibited pushcart food sales in the French Quarter, excepting vendors who had operated there for at least eight years. *Id.* at 304–06, 96 S.Ct. at 2517–18. The Court rejected a constitutional challenge, reaffirming that sovereigns "are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Id.* at 303, 96 S.Ct. at 2517. As for rational relationship, the Justices found that the classification furthered the city's objective of "preserv[ing] the appearance and custom valued by the Quarter's residents and attractive to tourists." *Id.* at 304, 96 S.Ct. at 2517.

These cases remain good law. They rest on the same doctrinal underpinnings as more recent Supreme Court opinions. *See, e.g., Stanglin*, 109 S.Ct. 1591; *Kadrmas*, 108 S.Ct. 2481; *Hodel*, 452 U.S. 314, 101 S.Ct. 2376. And in the post-*McGowan* era, the lower federal courts have been remarkably consistent in approving a variety of Sunday closing laws against equal protection onslaughts. *See, e.g., Home Depot, Inc. v. Guste*, 773 F.2d 616 (5th Cir.1985);

*Discount Records v. City of North Little Rock*, 671 F.2d 1220 (8th Cir.1982); *Woonsocket Prescription Center v. Michaelson*, 417 F.Supp. 1250 (D.R.I.1976); *Southway Discount v. Moore*, 315 F.Supp. 617 (N.D. Ala.1970).

### C. *Plaintiffs' Objections.*

■ Plaintiffs press forward in the teeth of this authority, complaining that the Closing Law's coverage is so spotty, and its exemptions so prevalent, that it has become ineffectual, hence, irrational. Acknowledging the theoretical legitimacy of the Closing Law's ostensible end,[10] appellees contest the suitability of the means. Thus, we must focus upon whether the Closing Law, in its current formulation, is rationally related to accomplishment of the government's stated goal under any reasonably conceivable set of facts. We think that it is.

1. *Statistical Evidence.* At the outset, we tether a stalking horse. Appellees make repeated reference to a piece of statistical evidence purporting to show that only 12.5% of the work force is covered by, *i.e.*, not exempt from, the Closing Law. They argue that a law permitting 87.5% of the population to work on Sundays cannot possibly bear any relationship to a uniform day of rest. We deem the argument naked sophistry. Passing the miasma of doubt which surrounds the statistic itself, the datum seems close to meaningless. The only relevant statistic would be the percentage of workers who *in fact* work on Sundays—a figure which plaintiffs did not supply. *Accord Caldor's, Inc. v. Bedding Barn, Inc.*, 177 Conn. 304, 417 A.2d 343,

---

**10.** The Closing Law's general objective was clearly limned by the Puerto Rico Supreme Court in an earlier round of court battles: the Closing Law "is founded on promoting, as far as possible, the existence of Sunday as an established day of rest, and therefore, the physical integrity of the worker and the nuclear family unit." *Pueblo Int'l, Inc. v. Rivera Cruz*, 117 D.P.R. 754, 756 (1986). The purpose of the Closing Law has widened, of course, since 1902. "Today, among other legitimate objectives, [the Closing Law's aims include] preventing the acceleration of the process of family decomposition, stopping the deterioration of the quality of

life, discouraging rampant, imitative consumerism and avoiding certain monopolistic practices." *Pueblo Int'l*, Translation at 174 (opinion of Justice Negron Garcia). As Justice Hernandez Denton wrote after a scholarly appraisal of the legislative history underlying the most recent set of amendments to the Closing Law: "It is undeniable that the Closing Law pursues purposes broader than merely guaranteeing a collective day of rest.... [T]he Legislature also aimed ... at achieving a certain economic balance on behalf of the small and medium-sized businessman." *Id.* at 257 (opinion of Justice Hernandez Denton).

348 (1979); *see also Home Depot*, 773 F.2d at 623 (upholding closing law applicable to roughly 15% of state's work force). The legislature might reasonably have concluded that, in order to make progress toward the desired day of rest, it was necessary to close only those establishments which might otherwise remain open on Sundays, or which dealt directly with the public. It would, for example, be supererogatory to ban government employees from Sunday work since in the ordinary course most government offices are closed on that day. Furthermore, the legislature need not approach goals on an all-or-nothing basis: "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson*, 348 U.S. at 489, 75 S.Ct. at 465.

It must also be remembered that the constitutional inquiry does not depend upon whether the Closing Law has in fact achieved its goal. Neither the wisdom nor actual efficacy of the legislative judgment is before us. A court may only ask whether Puerto Rico's legislature "rationally could have believed that [the Closing Law] would promote its objective." *Western & Southern L.I. Co. v. Board of Equalization*, 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981); *see also Two Guys*, 366 U.S. at 591, 81 S.Ct. at 1140 (discussing legislature's power).

2. *The Checkerboard.* Appellees point to the farrago of exceptions carved out over time as evincing the Closing Law's utter arbitrariness. Admittedly, the statute is a checkerboard. Appellees would have us determine whether each exemption, viewed in isolation, promotes a uniform day of rest. That is an incorrect coign of vantage. To uphold the Closing Law, it is enough if each exemption is rationally related to *some* legitimate legislative aim, and if the exemptions, collectively, do not erode the rationality of the legis-

lative scheme as a whole. *See McGowan*, 366 U.S. at 427, 81 S.Ct. at 1105. In sum, we review the Closing Law for its rational relationship to "any combination of legitimate purposes," *Kadrmas*, 108 S.Ct. at 2489, including the individual purposes which might undergird each exemption.

Having inspected the exemptions one by one, we are satisfied that they do not defeat the Closing Law's constitutionality. In the interests of brevity, we discuss only those exceptions which have drawn appellees' heaviest fire.

a. *Banks.* It seems apparent to us that the legislature could reasonably have concluded that this exemption, allowing banks to operate beyond normal working hours,[11] was necessary to the industry's health. The nature of the banking business might reasonably have led legislators to the tripartite conclusion that extended operation was uniquely required; that financial institutions, by and large, would not stay open overlong to provide routine banking services to the public; and that exempting banks "would not detract from the atmosphere of the day," *Gallagher*, 366 U.S. at 623, 81 S.Ct. at 1125, or alternatively, that the "interference with the absolute tranquility of the day is justified by [the banks'] requirement." *Two Guys*, 366 U.S. at 590, 81 S.Ct. at 1139.

b. *Tourist Zone.* Special treatment for historic "Old San Juan" and the tourist zone, gives us little pause. This exception could reasonably be found to promote the public weal by sustaining an important local industry, one whose clientele are in Puerto Rico to play, not work—and to whom the "day of rest" concept does not apply. Moreover, the exemption—limited by its terms to a relatively small, circumscribed area—could rationally be viewed as not significantly intruding upon the desired atmosphere. After all, "territorial uniformity is not a constitutional prerequisite." *McGowan*, 366 U.S. at 427, 81 S.Ct. at 1106.

---

11. This exception was engrafted on the Closing Law by the enactment of Law No. 103 (June 26, 1962). The contemporaneous legislative history of Law No. 103 clearly reflects that the purpose which drove the amendment was to allow banks to balance their daily transactions and maintain current recordkeeping without having to incur the extra expense of overtime wages.

c. *Industry.* Nor does the exemption for all industrial enterprises appear to be irrational. The legislature might well have believed that industrial plants would be less likely to remain open on a regular basis; that openings would not be disruptive, since many manufacturers do not deal directly with the public; or that allowing factories to operate would not "inject the distinctly commercial element that exists during the other six days of the week." *Gallagher,* 366 U.S. at 623, 81 S.Ct. at 1125. As the *Gallagher* Court said about wholesale enterprises, "it is conceivable that the legislature believed that [wholesale sales] would not detract from the atmosphere of the day, while [retail sales] would." *Id.* Weighing interference with the achievement of a uniform day of rest against the crying need to promote "industrial development and strengthen the economy," *Pueblo Int'l,* Translation at 197 (opinion of Justice Negron Garcia), the legislature might reasonably have concluded that the exception was justified. *Cf. Gallagher,* 366 U.S. at 623, 81 S.Ct. at 1125 (ascribing rational basis to legislative decision permitting wholesalers to open while requiring retailers to close).

d. *Local Produce.* The exception for the sale of local produce at public marketplaces might be justified by the need to encourage family farming on the island, and could well be seen as enhancing (rather than detracting substantially from) the provisions of a uniform day of rest.[12] In addition, the accessibility of public marketplaces selling local produce seems in keeping with "local tradition and custom." *McGowan,* 366 U.S. at 426, 81 S.Ct. at 1105; *see also Dukes,* 427 U.S. at 304, 96 S.Ct. at 2517. And because public markets are primarily devoted to sale of fruit, vegetables, baked goods, and the like, the legislature could have decided that "the nature of the[ ] products and the demand for them based on their freshness, justify a more flexible work schedule," *Pueblo Int'l,*

Translation at 200 (opinion of Justice Negron Garcia), thereby warranting exemption.

We do not dispute that the Closing Law is more a madras than a simple, consistent pattern. Yet, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Stanglin,* 109 S.Ct. at 1596, quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Even with its "myriad of exceptions," *McGowan,* 366 U.S. at 424, 81 S.Ct. at 1104, and "hodgepodge" characteristics, *Gallagher,* 366 U.S. at 622, 81 S.Ct. at 1125, Puerto Rico's Closing Law is not so arbitrary as to fail constitutional muster. Whether we view the exemptions individually, or in the context of the statute as a whole, we are not persuaded that the statute is constitutionally deficient. Appellees have failed to carry the heavy burden of showing that a presumptively valid local law lacks rational basis.

## V. CONCLUSION

Over three decades ago, the Court noted that: "The day is gone when [federal courts] strike down state laws, regulatory of business and industrial conditions because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson,* 348 U.S. at 488, 75 S.Ct. at 464. Plaintiffs' urgings amount to an invitation to retreat to an earlier era and commission the federal judiciary to make policy judgments reserved by the Constitution to the people of Puerto Rico, acting through their elected representatives. We decline the invitation. In upholding Puerto Rico's Closing Law, we do no more than recognize that, "under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson,* 372 U.S. at 729, 83 S.Ct. at 1030. If the Puerto Rico legislature has used its power unwisely—a topic on which we express no view—that is a matter for the voters, not for the federal courts.

---

**12.** Appellees attempted to argue before us that this classification violates the Commerce Clause. They raised this issue for the first time after trial and judgment below, in the course of their opposition to defendants' unsuccessful motion for a stay of the permanent injunction. This was too little, too late; we deem the argument waived.

We need go no further.[13] Under the rationality review which must be accorded to statutes like this one—statutes which involve neither suspect classifications nor fundamental rights—we are constrained to conclude that the Closing Law does not run afoul of the Constitution's equal protection clause. The district court erred in ruling to . the contrary. We therefore reverse the court's order and judgment, and direct that the injunction which was improvidently issued be vacated.

*Reversed.   The cause is remanded to the district court for vacation of the injunction and further proceedings consonant with this opinion.*

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

---

**13.** Our disposition of the appeal leaves us without any need to consider defendants' assigned errors concerning the appropriateness of injunctive relief and the injunction's breadth.

* Of the District of Massachusetts, sitting by designation.