Donald PEARSON, et al.,
Plaintiffs, Appellants,

v.

Michael FAIR, et al.,
Defendants, Appellees.

Donald PEARSON, et al.,
Plaintiffs, Appellees,

v.

Michael FAIR, et al.,
Defendants, Appellants.

Nos. 89–2051, 90–1271, 90–1272
and 90–1616.

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1990.

Decided June 3, 1991.

David R. Geiger with whom Joseph D. Halpern, Michele A. Whitham and Foley,

Hoag & Eliot were on brief, for Donald Pearson et al.

Abbe L. Ross, Asst. Atty. Gen., Narcotics Div., with whom James M. Shannon, Atty. Gen., was on brief for the Com'r of the Dept. of Correction, the Com'r of the Dept. of Mental Health, the Superintendent and Deputy Superintendent of the Massachusetts Correctional Institution at Bridgewater, Mass., and the Adm'r of the Treatment Center.

Before BREYER, Chief Judge,
SELYA, Circuit Judge, and LAGUEUX,* District Judge.

LAGUEUX, District Judge.

Plaintiffs are past or present patients at the Treatment Center for Sexually Dangerous Persons (the "Treatment Center"), a state institution located in Bridgewater, Massachusetts. Defendants are various state officials with authority over the Treatment Center, including the Commissioner of the Department of Correction, the Commissioner of the Department of Mental Health, the Administrator of the Treatment Center, and the Superintendent and Deputy Superintendent of M.C.I. Bridgewater.

At trial, plaintiffs challenged the sequestration policy and procedure employed at the Treatment Center. They argued that consent decrees entered in *King v. Greenblatt* required the defendants to observe clinical standards when sequestering Treatment Center patients. For relief, plaintiffs sought enforcement or modification of the decrees and civil contempt for defendants' alleged violations of the terms of the decrees.

## I. INTRODUCTION

Judge Mazzone consolidated this case with another dealing with the adequacy of treatment in the Treatment Center and pre-

sided over successive trials in the Spring of 1989. We decided the appeals of the issues raised in the adequacy of treatment cases in *Langton v. Johnston*, 928 F.2d 1206 (1st Cir.1991) (the so-called Bruder litigation). This opinion concerns only the matters raised in the so-called Pearson litigation.

The appeals stem from three distinct opinions of the District Court. First, plaintiffs appeal from the District Court's underlying judgment on the merits of the sequestration dispute. The District Court declined to modify the consent decrees to conform with plaintiffs' interpretation, and therefore dismissed the complaint.[1] On appeal, plaintiffs challenge several aspects of that opinion. They argue that the consent decrees themselves plainly require imposition of clinical standards to sequestrations at the Treatment Center. Even if that is not true, they contend, the equal protection clause and the doctrine of substantive due process constitutionally require that result. Plaintiffs also argue that the District Court erred in failing to find that the defendants violated procedural due process. Finally, plaintiffs contend that the District Court's alleged failure to award final relief violated Rule 54 of the Federal Rules of Civil Procedure.

The second opinion appealed from concerns attorneys' fees. Shortly after trial, plaintiffs moved for an award of attorneys' fees and costs in the amount of $673,558.00. The District Court awarded plaintiffs approximately one-tenth of their requested amount, a decision which both sides appeal.[2]

The third opinion appealed from is the District Court's denial of plaintiffs' "Motion for Enforcement, Clarification, or Modification of Previous Court Orders." This motion, made approximately nine months after the District Court's sequestration

---

* Of the District of Rhode Island, sitting by designation.

1. The District Court also refused to hold defendants in civil contempt, a decision which the plaintiffs have not appealed. Plaintiffs argue that they were not obligated to show contempt in order to have the District Court interpret and enforce the decrees. Instead, they argue that

they only needed to "establish that time and experience had shown that the decrees had not achieved their intended purposes."

2. Although cross-appeals have been filed on the attorneys' fee opinion, in this decision the term "appellants" refers to plaintiffs and the term "appellees" refers to defendants.

opinion, challenged the defendants' decision to place a Treatment Center patient in the new Minimum Privilege Unit (the "MPU"). The plaintiffs appeal the denial of that motion.

For the reasons set forth below, we affirm the District Court's opinions on the underlying sequestration dispute and on the MPU controversy. We vacate the District Court's decision on attorneys' fees and remand that cause for further proceedings.

## II. BACKGROUND

An overview of the Treatment Center and its purposes was provided in *Langton*, rendering such an undertaking unnecessary here. In addition, this Court has previously outlined the *King* litigation and sees no purpose in reiterating that here. *See Pearson v. Fair*, 808 F.2d 163 (1st Cir.1986) (per curiam). Suffice it to say that two consent decrees concerning the Treatment Center emanated from the *King* litigation. The first decree was filed on June 3, 1974, and the second, a supplemental decree, was entered eight days later. Attached to the supplemental decree was a document entitled "Policies and Procedures Concerning Inappropriate and Unacceptable Behavior" (the "Policies"). The text of both the decrees and the Policies is set out in the appendices.

### A. *Procedural Path*

The procedural path of the underlying sequestration dispute is long and rocky. The District Court expertly summarized the course of the litigation in its unpublished opinion. That course is reviewed here, with acknowledgements to the comprehensive history provided by the District Court's opinion.

The *Pearson* complaint was filed pro se on December 20, 1981 by six Treatment Center patients. An amended complaint was filed on January 20, 1982, by which time plaintiffs were represented by counsel. The District Court allowed a seventh plaintiff, Calvin Tate, also a Treatment Center patient, to intervene on May 27, 1988.[3] Class certification in this action has never been sought.

The thrust of plaintiffs' complaint is that the sequestration practices employed at the Treatment Center violate the terms of the *King* consent decrees.[4] Plaintiffs argue that sequestration practices must accord with generally accepted clinical standards. They point to the standards in M.G.L.A. Chapter 123, Section 21 as evidence of generally accepted clinical standards.[5]

The history of the sequestration litigation is best understood by following the plaintiffs' many motions for injunctive relief. These motions sought to remedy alleged violations of the decrees and force the defendants to follow clinical standards when sequestering patients.

### 1. *History Before Remand*

Plaintiffs first requested a temporary restraining order on October 25, 1982. The motion sought to prevent the continued sequestration of plaintiff Gagne in a manner allegedly inconsistent with *King*. Gagne was sequestered on September 30, 1982 because a nine-inch long home-made knife was discovered in a cabinet to which he had access and because he had a history of assaultive or threatening behavior that sometimes involved the use of a knife.

Judge Tauro denied plaintiffs' motion for the temporary restraining order and referred the matter to Magistrate Collings. In a detailed report dated December 9, 1982, the Magistrate determined that plaintiffs' motion for preliminary injunction should be allowed in part. He recom-

---

**3.** Plaintiff Donald Pearson has been released from the Treatment Center and is incarcerated at a state correctional facility.

**4.** On February 5, 1982, defendants moved to dismiss based on plaintiffs' alleged lack of standing to enforce the *King* decrees. Judge Tauro referred the matter to Magistrate Alexander, who issued a recommendation on June 4,

1982 that the motion be denied. Judge Tauro adopted that recommendation on July 8, 1982. Although defendants have never been satisfied with that decision, as evidenced by their arguments to Judge Mazzone in their trial memos, the standing issue is not before this Court.

**5.** *See infra* note 14.

mended that defendants be enjoined from continuing Gagne's sequestration until they provided him with a hearing as required by the Policies. Defendants provided Gagne with a hearing on December 30, 1982. Judge Tauro adopted the Magistrate's report and recommendation on February 9, 1983.

Plaintiffs next requested injunctive relief on September 13, 1983. Complaining still about the sequestration of Gagne, this motion sought contempt, sanctions, and another preliminary injunction. Plaintiffs alleged that Gagne had continued to be sequestered in violation of *King* and the Court's earlier order. Further, they contended that the hearing provided to Gagne was inadequate. Judge Tauro again referred the matter to the Magistrate. Magistrate Collings held hearings in October and November of 1983. On May 2, 1984, he counselled denial of plaintiffs' motion in a fifty-two page report and recommendation.

The Magistrate found that the defendants substantially complied with *King* and the Policies. He explicitly found that Gagne had not been sequestered as punishment; rather he concluded that sequestration was the only way for the Treatment Center staff to treat him and secure the safety of other patients. The Magistrate also determined that all aspects of Gagne's December, 1982 hearing were sufficient, and advised denial of injunctive relief.

Plaintiffs objected to the Magistrate's report. In November of 1984, a hearing was held before Judge Tauro and the matter was taken under advisement. Extensive settlement discussions between the parties ensued. Approximately one year later, on November 19, 1985, following the Court's suggestions, the defendants filed "Revised Policies."[6] In March of 1986, the plaintiffs moved again for contempt and a preliminary injunction. Finally, on April 4, 1986, Judge Tauro entered a final order purporting to dispose of all pending matters in the case.[7] The order denied plaintiffs' motion for a finding of contempt, sanctions, and preliminary injunction. It also ordered the defendants to comply with the *King* consent decrees and the Revised Policies in all future incidents of sequestration.

Both parties appealed Judge Tauro's order. This Court vacated the final order on the grounds that the District Court "fashion[ed] definitive relief without taking any evidence" and failed to make accompanying findings of fact or conclusions of law. *Pearson v. Fair*, 808 F.2d 163, 165 (1st Cir.1986) (per curiam). The case was remanded and reassigned to Judge Young.

### 2. *History After Remand*

After remand the plaintiffs renewed their series of motions seeking preliminary injunctive relief. Between July and December of 1988, these motions primarily concerned the sequestration of plaintiff Tate.

On July 12, 1988, plaintiffs sought preliminary injunctive relief to remedy the sequestration of Tate, which allegedly violated both the *King* consent decrees and the Revised Policies. Tate was sequestered on April 7, 1988 for allegedly turning over a desk on top of a clinical staff member. Plaintiffs challenged the continued sequestration on the grounds that hearings reviewing Tate's seclusion were held too infrequently and were otherwise inadequate.

Judge Young held an emergency hearing on July 15, 1988. On July 22, 1988 he denied plaintiffs' motion, but without prejudice to its renewal after August 15, 1988, if Tate was still secluded. Judge Young believed that the defendants had acted to protect others and Tate from himself and that these concerns outweighed any injuries Tate suffered from sequestration. Judge Young also remarked that the defendants were not following their own procedures. He noted that the plaintiffs had shown a reasonable likelihood of success on the issue of whether the Revised Policies embodied the procedural due process stan-

---

6. The terms of the Revised Policies are set out *infra* Part II.B.

7. A copy of the final order is published as an appendix to *Pearson v. Fair*, 808 F.2d 163, 167 (1st Cir.1986) (per curiam).

dard to which Tate was entitled under the *King* decrees.

On July 28, 1988, Tate was released from the sequestration unit. However, he was returned there in early August of 1988. On August 17, 1988, plaintiffs again filed a motion for a preliminary injunction. Judge Young held an emergency hearing the next day and issued an order granting the preliminary injunction from the bench. The injunction ordered the defendants to release Tate from sequestration and to follow the *King* decrees and the Revised Policies, and was to become effective at noon on August 26, 1988.[8]

On August 24, 1988, the defendants promulgated an entirely new sequestration policy for the Treatment Center known as the Isolation Policy and Procedures (the "Isolation Policy"), which was to become effective on August 25, 1988 at 9:00 a.m.[9] The defendants informed the District Court of the new Isolation Policy on August 25, 1988.

On August 26, 1988, Judge Young issued the first of three preliminary injunctions which modified the Isolation Policy. The second preliminary injunction was handed down in September and the third in November.[10]

On January 16, 1989, Judge Young issued an order recusing himself from the case under 28 U.S.C. § 455(a). The matter was redrawn to Judge Mazzone on February 6, 1989. Judge Mazzone presided over the trial which commenced on March 16, 1989 and concluded on March 29, 1989.

For a variety of reasons, the details of which will be examined in the next section, on August 28, 1989, the District Court dismissed the amended complaint and entered judgment for the defendants. The Court ordered Judge Young's orders modifying the Isolation Policy vacated, but stayed that order on an interim basis pending further litigation in *King*.

On October 27, 1989, and on December 4, 1989, the plaintiffs moved for an award of attorneys' fees and costs under 42 U.S.C. § 1988. The District Court awarded plaintiffs $69,000.00 in attorneys' fees and costs, approximately one-tenth of the amount they had sought.

Finally, on May 18, 1990, plaintiffs filed a motion to enforce, clarify, or modify the District Court's earlier orders. Plaintiffs contended that defendants' placement of patient James LeBlanc in the new MPU violated the modified Isolation Policy. On June 26, 1990, the District Court denied the motion. Plaintiffs appeal that decision as well.

B. *History of Sequestration Practices*

Seclusion practices at the Treatment Center have changed several times during the course of this litigation. A brief history of the different practices is provided here.

1. *The Policies*

The Policies allowed a clinical staff member to seclude a patient when it appeared "to be in [the patient's] best interest." However, correctional officers could sequester only those patients whose conduct fell into one of several broad categories of "inappropriate and unacceptable behavior," and then only if there was a "clear and present danger of physical harm from such patient to others or to himself."

Once sequestered, the Policies required the senior clinical person on call to be notified and required that person to "promptly" investigate the basis for sequestration. If this initial investigation upheld the sequestration decision, the Policies mandated that a special clinical staff conference ("SCSC") be "convened at the earliest possible moment and in any case, within 72 hours of the sequestration." The Policies stated that the specific purpose of the SCSC was "to insure that any restrictions which have been or may be imposed [were]

---

**8.** This order was later mooted by Judge Young's August 26, 1988 order.

**9.** For a description of the Isolation Policy see *infra* Part II.B.

**10.** The text of these three orders is set out *infra* Part II.B.

demonstrably fair and in the best interest of both the patient and the general body of patients."

The Policies specified which clinical staff members were required to attend the conference and outlined the procedures the SCSC was required to follow. The Policies also spelled out the procedures to use in appealing a SCSC decision.

### 2. *The Revised Policies*

The Revised Policies were filed by the defendants on November 19, 1985. They differed from the Policies in two respects. First, they did not allow a clinical staff member to impose sequestration solely on the basis that it was in the patient's "best interest." Second, the Revised Policies limited the SCSC's ability to maintain a patient in sequestration only to situations where the SCSC found, in writing, that:

(1) the patient would continue to present a clear and present danger of physical harm to others or to himself if released from sequestration; (2) that sequestration is an appropriate form of treatment for the patient; and (3) that no other less restrictive form of confinement would be appropriate.

Judge Young, in his August 18, 1988 order, required that at least one member of the SCSC be a licensed psychologist, and prohibited any sequestrations without the psychologist's written concurrence. In addition, the order required the SCSC report to indicate the appropriate treatment and the manner by which sequestration would contribute to the patient's treatment.

### 3. *The Isolation Policy*

The defendants promulgated the Isolation Policy on August 25, 1988. The Isolation Policy was intended to apply only to a patient "confine[d] ... for 24 hours per day in a specifically designated unit." The Isolation Policy allowed correctional officers to isolate [11] a patient whenever they or a clinical staff member had a "reasonable basis for believing that a patient ha[d] engaged in inappropriate or unacceptable behavior." The Isolation Policy also added the following broad category of inappropriate and unacceptable behavior to the seven contained in the Policies: "Any behavior which may disrupt the ability of the Treatment Center to provide treatment to other patients, or interference with the orderly administration of, and the treatment goals of, the Treatment Center."

The Isolation Policy also detailed the procedures to be used in reviewing the initial sequestration decision. An Initial Isolation Clinician ("IIC") [12] was required to evaluate the patient within one working day. The IIC would then issue a recommendation, which the Assistant Administrator would review. If the patient remained in isolation, the Isolation Policy required a hearing before an Isolation Review Clinician ("IRC"). [13] The Assistant Administrator was bound to consider the IRC determination in deciding on the appropriateness of continued isolation. His decision was then appealable to the Administrator. The Administrator also had the power to suspend the Isolation Policy if required to protect the safety of other patients and the staff.

### 4. *Judge Young's Modifications to the Isolation Policy*

Sequestrations at the Treatment Center are currently governed by the Isolation Policy as modified by Judge Young's orders. The first modification was ordered on August 26, 1988. It stated:

a. Only qualified psychiatrists and psychologists may serve as Initial Isolation Clinicians and Isolation Review Clinicians;

b. Administrative Review of Isolation and Treatment Recommendations ... may result in modification of those recommendations only if a psychiatrist concurs in writing with any such modification and the modification furthers the treatment of the patient[;]

---

**11.** The Isolation Policy employed the term "isolation" to refer to sequestration.

**12.** Any clinical staff member could be an IIC.

**13.** The IRC could be anybody so designated by the Administrator.

c. In view of the sweeping language of paragraph V 9 of the Policy, its requirements may not be suspended, either for emergencies ... or otherwise.

Plaintiffs moved on August 30, 1988 to modify this order. At a lobby conference on September 22, 1988, Judge Young again modified the Isolation Policy in two respects. First, he changed the definition of "days" from working to calendar days. Secondly, he restricted the Assistant Administrator's ability to modify initial sequestration decisions by imposing a requirement that any such change needed the written concurrence of a psychiatrist or psychologist on the Treatment Center staff.

Plaintiffs again moved for contempt, sanctions, and preliminary injunction on November 4, 1988. Plaintiffs based their motion on the allegedly unlawful sequestration of Tate, which had commenced on October 26, 1988. Plaintiffs also renewed their motion to modify the order entered on August 26, 1988. This motion sought to redefine the term "isolation."

On November 21, 1988, Judge Young issued the third order modifying the Isolation Policy. This order:

1. Defin[ed] "isolation" ... to mean the confinement of a patient in the Crisis Unit or in any other place within the institution other than the patient's room for more than eight hours per day.

2. [Permitted] isolation ... only in emergency situations. For the purpose of this order, emergency situations shall constitute only the following three circumstances:

   a. instances where the patient attempts or does serious harm to himself or others;

   b. instances where the patient seriously disrupts the therapeutic environment;

   c. instances where the patient's conduct clearly demonstrates the serious and imminent threat of either of the above two enumerated situations.

Although the District Court vacated these modifications to the Isolation Policy, it stayed implementation of that order. Thus, sequestrations at the Treatment Center are currently governed by the modified Isolation Policy.

## III. DISCUSSION

Appellants argue several issues on appeal. First, they contend that the District Court erred in ruling that the appellees are not required to follow accepted clinical practices, such as those embodied in M.G. L.A. Chapter 123, Section 21, when sequestering patients at the Treatment Center. Appellants argue that the *King* consent decrees, the equal protection clause, and the doctrine of substantive due process all compel application of Section 21 type standards. Second, they argue that the District Court erred in not finding the appellees' violations of the *King* decree and their own policies to be a violation of procedural due process. Third, they argue that the District Court erred in failing to award final relief clarifying and enforcing the *King* decrees. Fourth, they argue that the District Court erred in not following its own prior orders in the MPU dispute. Finally, they argue that the District Court erred in not awarding them their requested attorneys' fees and costs. With respect to this last issue, appellees argue that the District Court erred in awarding the appellants any fees.

A. *Must the Appellees Apply Section 21 or Substantially Similar Standards to the Sequestration of Patients at the Treatment Center?*

The appellants contend that seclusion must conform with accepted clinical practices. They argue that such practices are adequately outlined in M.G.L.A. Chapter 123, Section 21.[14] The appellants argue that the District Court had power to interpret the consent decrees through its inherent powers, *Boston Chapter, NAACP v. Beecher*, 679 F.2d 965, 972 (1st Cir.1982), *vacated on other grounds, Boston Firefighters Union, Local 718 v. Boston Chapter, NAACP*, 461 U.S. 477, 103 S.Ct. 2076,

---

**14.** Section 21 allows restraint only in cases of emergency and mandates stringent procedural requirements for monitoring the patient and reviewing the restraint decision.

76 L.Ed.2d 330 (1983), and possessed explicit power by virtue of an express provision in the supplemental consent decree.[15]

The District Court found that neither the *King* decrees nor the equal protection clause required the application of Section 21 or substantially similar standards to the seclusion of patients at the Treatment Center. We agree.

■ In reviewing the District Court's decision, we must be aware of that Court's great discretion over the consent decree which provides the basis for this litigation. Contempt decisions in public law litigation such as this are "worthy of considerable deference." *Langton*, 928 F.2d at 1222. Although appellants here do not challenge directly the finding of no contempt, their challenge to the District Court's decision not to use its equitable powers to modify the consent decrees must overcome the same level of deference.

Appellants argue that deference is not warranted here because the *King* decrees were entered by one judge, and three other judges have presided over this case. Furthermore, appellants argue, the trial judge was "entirely uninvolved" in the case until the eve of trial. This argument is without substance. It is the district court as an institution that merits deference. We are unwilling to develop a litmus test for use in analyzing the depth of a trial judge's familiarity with a case in order to determine the resulting deference to which he or she is entitled. Indeed, in this case, the trial judge presided over an eight-day trial, plus the six-day adequacy of treatment trial. His written opinions on the Treatment Center cases constitute nearly two hundred pages. Plaintiffs themselves demonstrate the confusion their argument would produce. Another section of their brief emphasizes the trial judge's experience with the case: "while Judge Mazzone may have been relatively new to the case, he had the benefit of the entire eight-year record, including the numerous interim orders issued by Judge Young, as well as the eight-day trial at which extensive evidence was introduced."

*1. The King Decrees*

■ Appellants contend that the purpose of the *King* consent decrees was to ensure that a clinical rather than a correctional model of seclusion governed at the Treatment Center. They argue that the explicit language of the decrees and the circumstances surrounding their formation makes this clear.

The District Court was not persuaded that the express wording of the decrees required application of standards such as those in M.G.L.A. Chapter 123, Section 21 to Treatment Center patients, all of whom are committed under Chapter 123A. Indeed, the decrees are conspicuously silent on the issue. The District Court refused to analyze isolated provisions in a vacuum. For example, the first paragraph of the consent decree states that, "The Treatment Center ... shall be treated as a facility of the Department of Mental Health." The District Court did not construe that as evidence of the parties' intent to have Section 21 type standards apply.

The District Court believed that the parties would not have attached the Policies to the supplemental consent decree if they had intended Section 21 or substantially similar standards to govern sequestrations at the Treatment Center. The Policies set out sequestration practices that differ markedly from standards such as those contained in Section 21. The plaintiffs disputed the significance of the Policies. They argued that the supplemental consent decree clearly states that the Policies were not adopted by or specifically approved by the Court, and thus were outside of the four corners of the decree. For this reason, plaintiffs argued to the District Court that the Policies should not be considered when construing the decrees. The District Court determined that the Policies helped to show the "circumstances surrounding the formation of the consent order," and thus were a proper aid to construction of the decrees. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95

---

**15.** The decree states, "The right to amend this   decree is retained by the Court."

S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). Indeed, the supplemental consent decree states that the defendants deemed the Policies "to be in conformity with the provisions of this Final Decree." In addition, the decree states that plaintiffs did not object to this belief of the defendants.

The District Court also noted that paragraph five of the first decree which provides "that patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment" would be frustrated by the application of Section 21 type standards. The Court expressly found that "Section 21 does not necessarily provide for less restrictive conditions than present sequestration practices." Indeed the supplemental consent decree states that a secluded patient should have "clean linen, a table and chair, a place for storage of clothing and belongings and access to a working sink, toilet and shower." The Policies state that a sequestered patient shall have available to him "reading and writing materials, radio or television ... [and] other recreational materials." In contrast, the plaintiffs' own expert testified that clinical standards of sequestration employ a very bare room, subdued and locked, containing only a mattress.

The District Court also determined that the circumstances surrounding the formation of the *King* decrees did not indicate that the defendants were bound to apply Section 21, or substantially similar standards, to sequestrations at the Treatment Center.[16] The absence of a reference to Section 21 in the consent decrees, even though Section 21 had been enacted four years previously, particularly impressed the District Court. That fact also impresses this Court. The District Court also found persuasive evidence that the consent decree drafters actually omitted a provision which would explicitly have made Section 21 applicable.[17] This Court also finds that evidence persuasive.

On appeal, appellants seek to rehash many of these arguments. We will refrain from indulging in that exercise. Nothing in the language of the decrees or the context of their drafting suggests that appellees are obligated to follow clinical standards such as those in Section 21. To the contrary, the Policies attached to the supplemental decree, the inconsistency between clinical standards and the parties' express agreements about sequestration conditions, and the intended silence of the decrees with respect to application of clinical standards, all gave the District Court ample support for its conclusion. Appellants have not shown that the decrees sought to have Section 21 or substantial similar standards apply. They surely have not pointed to anything which would permit this Court to determine that the District Court abused its discretion in interpreting the consent decrees.

### 2. *Equal Protection and Substantive Due Process*

◼ Appellants also argue that the equal protection clause of the fourteenth amend-

---

**16.** Judge Mazzone was not the first to consider this issue. In his May 1984 report, Magistrate Collings expressly declined to find that Section 21 applied to the Treatment Center. He observed that Section 21 was enacted four years before the entry of the decrees. He also believed that if Section 21 was meant to be "applicable to patients at the Treatment Center, there would have been no need for many provisions of the Supplemental Consent Decree." Judge Tauro never ruled on this report, even though an objection was filed, choosing instead to issue his final order. On December 21, 1988, Judge Young "decline[d] to resolve as part of a motion for preliminary injunction, the issue whether the provisions of [Section] 21 apply to patients at the Treatment Center."

**17.** The District Court found that the original consent decree was "merely borrowed" from the *Williams v. Lesiak* case and that the parties reproduced it in this case to ensure that it would remain in effect after entry of the supplemental consent decree. The only substantive difference between the decree as it appears in *Lesiak,* and as it was entered in this case is the deletion of the following sentence in paragraph six: "these rules and regulations shall include but shall not be limited to the following: a) implementation of the tier system of security; b) application of the rules of the Department of Mental Health governing the civil rights of patients pursuant to M.G.L. c. 123 to the patients at the Treatment Center insofar as consistent with M.G.L. c. 123A." The *Lesiak* decree is reprinted as an appendix to *Langton. See* 928 F.2d at 1227.

ment compels application of the seclusion and restraint practices of M.G.L.A. Chapter 123, Section 21, or substantially similar standards, to Treatment Center patients.[18]

The equal protection clause seeks to ensure that similarly situated people are treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). It " 'does not require things which are different in fact or opinion to be treated in law as though they were the same.' " *Plyer v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)). The Supreme Court has stated that:

> The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*Plyer*, 457 U.S. at 216, 102 S.Ct. at 2394. The legal standard applicable to appellants' equal protection claim is crystal clear. Massachusetts' statutory scheme "does not deny equal protection of the laws so long as it can be said to be rationally related to a legitimate governmental purpose." *Doe v. Gaughan*, 808 F.2d 871, 881 (1st Cir.1986). Stated another way, appellants' equal protection claim can only be upheld if the classifications codified in Chapters 123 and 123A are "irrational and arbitrary." *Doe*, 808 F.2d at 880. The burden is on the appellants to show the irrationality of the challenged statutory classifications. *See Montalvo–Huertas v.*

*Rivera–Cruz*, 885 F.2d 971, 979 (1st Cir. 1989).

The District Court rejected the plaintiffs' equal protection claim principally on two grounds. First, it concluded that Treatment Center patients are not necessarily mentally ill, unlike the population in state mental hospitals committed under Chapter 123. Secondly, it determined that the Treatment Center population is "thoroughly unique" because the Center's mission is not only to treat sexually dangerous patients, but also to protect society from those patients.

On appeal, appellants claim that Chapters 123 and 123A provide for essentially equivalent commitment processes which must accord patients equivalent procedural and substantive protections. They also argue that the District Court erred in finding that Treatment Center patients are not mentally ill.

It is clear that Chapters 123 and 123A do not provide for essentially equivalent commitment processes. We highlight only some of the differences here. Commitment to a mental health hospital requires a state court finding that the "failure to hospitalize such person would create the likelihood of serious harm *by reason of* mental illness." 104 C.M.R. § 3.01(a) (emphasis added). The District Court found that the definition of "mental illness" applicable to Chapter 123 commitments does not apply to the "overwhelming majority" of Treatment Center patients. The plaintiffs' own expert conceded that between five and fifteen percent of Treatment Center patients do not suffer from *any* mental disorder.

In contrast, commitment to the Treatment Center requires a finding that a person's "misconduct in sexual matters indicates a general lack of power to control his sexual impulses" and who "as a result, is likely to attack or otherwise inflict injury on" others. Mass.Gen.L. ch. 123A, § 1. The commitment processes also differ in another critical manner. All involuntary

---

**18.** It is unnecessary to address the merits of appellants' substantive due process argument at any length. The appropriate standard of constitutionality is identical to the rationality standard employed in equal protection analysis. *See Montalvo–Huertas v. Rivera–Cruz,* 885 F.2d 971, 976 n. 7 (1st Cir.1989).

commitments to the Treatment Center may only be initiated by the State, must be preceded by a criminal conviction, most often for a violent or aggressive sexual act, and are of indefinite duration. Involuntary commitments under Chapter 123 may be initiated by several parties other than the State, need not be related to any criminal activity, and are always of limited duration.

Despite these differences in the statutory commitment processes,[19] appellants argue that equal protection precedent exists which requires the imposition of Section 21 type standards at the Treatment Center. They cite two United States Supreme Court cases to support this argument. Both *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), however, address only the procedural aspects of commitment.

The facts of *Baxstrom* are straightforward. Petitioner Baxstrom had been convicted of second degree assault and was serving his two and one half year sentence at a state prison. During that time, he was declared to be insane and was transferred to a state hospital used for the care of mentally ill prisoners. At the end of his sentence, Baxstrom was civilly committed without the right to a de novo review by jury trial on the issue of his sanity. Baxstrom was not afforded the opportunity for jury review despite the existence of a state law providing other civilly committed persons with that right. The Supreme Court held that the differences in the availability of jury review denied Baxstrom the equal protection of the laws. *Baxstrom*, 383 U.S. at 110, 86 S.Ct. at 762.

In *Humphrey*, the petitioner had been convicted of the misdemeanor offense of contributing to the delinquency of a minor. The maximum sentence for the crime was one year. Under authority of a state sex crimes statute, the petitioner was then committed to the "sex deviate facility," a confinement which could potentially be indefinite. The petitioner argued to the lower courts, unsuccessfully, that he had been denied equal protection of the laws because his commitment under the sex crimes statute was made without a jury determination, a protection afforded to those committed under another statute on mental health. The Supreme Court held that the petitioner's argument merited an evidentiary hearing before the district court. In remanding the case, the Court wrote: "The equal protection claim would seem to be especially persuasive if it develops on remand that petitioner was deprived of a jury determination, *or other procedural protections*, merely by the arbitrary decision of the State to seek his commitment under one statute rather than the other." *Humphrey*, 405 U.S. at 512, 92 S.Ct. at 1053 (emphasis added).

Appellants here have not challenged the procedural routes that have led patients to the Treatment Center. They only challenge the constitutionality of the Treatment Center's employment of methods of sequestration that differ from those Section 21 requires be used at state mental hospitals. Neither *Humphrey* nor *Baxstrom* are pertinent to that issue.

Appellants next argue that the Massachusetts Supreme Judicial Court opinion of *In re Andrews*, 368 Mass. 468, 334 N.E.2d 15 (1975), requires the appellees to follow Section 21. In *Andrews*, the SJC held that: "[i]n view of the generally similar functions and effects of c. 123A, § 6 and c. 123, § 18, the Commonwealth is constitutionally bound to extend substantially similar procedural and substantive safeguards to persons affected by either statute." 368 Mass. at 480, 334 N.E.2d at 22. However,

---

**19.** Appellants overemphasize the relative importance of proving the existence of essentially equivalent commitment processes. Even if the Commonwealth legislatively chose to have similar commitment processes for two distinct groups, that would not constitutionally bind it to have similar sequestration policies. Appellants would still have to show that the sequestration policies were not rationally related to a legitimate governmental purpose. *Hodel v. Indiana*, 452 U.S. 314, 331, 101 S.Ct. 2376, 2386, 69 L.Ed.2d 40 (1981) ("Social and economic legislation ... that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose.").

in *In re Thompson*, 394 Mass. 502, 507–08, 476 N.E.2d 216, 220 (1985), the SJC limited *Andrews* "to those cases where there are unjustified differences in statutory schemes which have 'generally similar functions and effects.' " *Thompson* rejected a claim that Treatment Center patients were entitled to an annual review similar to the one afforded confinees under Chapter 123. The SJC reasoned that "[b]ecause confinement at the treatment center as a sexually dangerous person, and civil commitment to Bridgewater State hospital, do not have 'generally similar functions and effects,' ... the differences in the availability of less restrictive confinement under c. 123 and c. 123A are fully justified." *Thompson*, 394 Mass. at 508, 476 N.E.2d at 220.

No authority cited by appellants supports the argument that the equal protection clause requires application of Section 21 to Treatment Center patients. They have failed to carry their burden of showing that it is arbitrary and irrational for the Treatment Center to use sequestration practices that differ from the practices Section 21 mandates for mental health hospitals.

B.  *Procedural Due Process*

█ Appellants next argue that the District Court erred in finding that the defendants' violations of the *King* decrees and their own policies did not violate procedural due process.[20] The District Court determined that the plaintiffs had a liberty interest in "remaining in the general population." The Court stated that the language of the supplemental consent decree and the Policies was "sufficiently mandatory" and constituted more than "procedural guidelines." Neither side has chosen to argue in support or opposition to the District Court's finding of a liberty interest. We need not express an opinion on the sustainability of that finding, which the District Court admitted was a "close question." Even if the appellants are assumed to have

a liberty interest, we are satisfied that the District Court correctly held that the maximum process due plaintiffs is found in the supplemental consent decree and the Center's own policies.

█ The District Court concluded that "the SCSC attempts to conduct fair and balanced hearings, provid[e] patients with the opportunity to be heard, to present evidence, and to receive assistance." It is not enough for appellants to argue that the District Court adopted a version of the facts different than the one they advocate. This Court simply cannot discount a District Court's factual determinations made after trial without a showing of clear error.

After concluding that the defendants substantially complied with the decrees and Policies, the District Court (1) refused to hold defendants in contempt and (2) refused to modify the decrees.

█ Appellants do not appeal the District Court's determination denying an order of contempt. They only challenge the District Court's decision not to modify or clarify the decrees. Appellants argue that the District Court should have changed the decrees because time and experience has shown that their intended purposes have not been achieved.

Of course, as stated above, the District Court has broad discretion over the terms of consent decrees in public law litigation. Having concluded that neither the *King* decrees nor the federal constitution requires the application of Section 21, or substantially similar standards, to sequestrations at the Treatment Center, and having accepted the District Court's determination that defendants substantially complied with the decrees, we are unable now to conclude that the District Court abused its discretion in refusing to modify those decrees. The District Court acted well within the parameters of its discretion in concluding that modifying the decrees was unnecessary.

---

**20.** Plaintiffs' complaint does not contain any allegations of independent constitutional violations. However, the supplemental consent decree states that sequestrations "shall be effected in conformity with minimum standards of procedural due process." The procedural due process argument apparently attempted to demonstrate that defendants' numerous alleged violations compelled a finding of contempt, or at least showed that modifications to the decrees were necessary.

## C.  *Awarding of Final Relief*

Appellants also contend that the District Court erred in refusing to enter relief clarifying and interpreting the *King* consent decrees.  This argument is based on two grounds: Rule 54(c) of the Federal Rules of Civil Procedure and general principles of equity.  Rule 54(c) states that, "every final judgment shall grant the relief to which the party *in whose favor it is rendered* is entitled, even if the party has not demanded such relief in the party's pleadings." (emphasis added).  There is a short, but conclusive, answer to appellants' Rule 54(c) argument: because final judgment was not rendered in appellants' favor, appellants were not entitled to *any* relief.  Although the District Court noted the imperfection of the consent decrees, and suggested the possibility of amending them in another case, it did not err by refusing to enter such relief in this case.  To hold that the District Court was in error on this point would seriously invade its sphere of discretion in supervising the terms of a consent decree and ignore the plain language of Rule 54(c).

In support of their equitable argument, appellants cite *Alexander v. Hillman,* 296 U.S. 222, 242, 56 S.Ct. 204, 211, 80 L.Ed. 192 (1935) for the proposition that courts of equity generally should "decide all matters in dispute and decree complete relief." Again, the District Court here properly decided the matters in dispute, albeit in the defendants' favor, and in its discretion issued appropriate relief.  The District Court did not violate any longstanding principle of equity by deciding for the defendants on the merits of the sequestration dispute.

## D.  *Minimum Privilege Unit*

■ Appellants also claim that the District Court erred by failing to apply its own order, which stayed the vacation of Judge Young's modifications to the Isolation Policy, to the defendants' sequestration of patients in the MPU.[21]

The trial judge expressly stated during a hearing conducted at a view of the MPU

that patient LeBlanc was in "isolation." The appellants argue that because Judge Mazzone made that statement and because defendants admitted that the modified Isolation Policy was not followed in seclusions at the MPU, the District Court was compelled to find the defendants in violation of its earlier order.  Appellants view the District Court's denial of their motion as "judicial abdication." Appellants, however, ignore the following language in the District Court's memorandum and order:

> The entire record ... has persuaded me that the MPU is a permissible level of security within the *Williams* decree,[22] that my observations of the MPU do not show any unconstitutional level of confinement, and that the procedures for placement in the MPU define clearly the behavioral qualifications for placing in the MPU.

The District Court was not compelled to order defendants to follow the modified Isolation Policy just because a patient had been placed into isolation.  No consent decree and no court order prohibits the defendants from adopting a procedure which, in their professional judgment, allows appropriate treatment of patients who pose significant security threats to the institution. Indeed, the first consent decree specifically requires the defendants to have "a system of differing security for different categories of patients."

Here the District Court found that the procedures supporting the MPU were carefully tailored to meet the Treatment Center's need of treating patients who require a highly structured environment.  The MPU is the most secure unit at the Treatment Center.  The MPU procedures describe the behavior which results in placement in the MPU, and also describes the four phases of lessening restrictions through which a patient may progress.

Confronted with conflicting testimony about the appropriateness of the placement of LeBlanc in the MPU, the District Court

---

21.  The MPU was created on April 15, 1988, after six of the twelve sequestration rooms were converted.

22.  The "*Williams* decree" referred to is largely the same as the first *King* decree.  *See supra* note 17.

declined "to substitute [its] judgement for that of the Treatment Directors Board." We see no error in that decision. *See Bell v. Wolfish,* 441 U.S. 520, 544, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979).

### E. *Attorneys' Fees*

#### 1. *District Court's Findings*

Five months after the District Court dismissed the amended complaint, plaintiffs moved for counsel fees pursuant to 42 U.S.C. § 1988. The defendants objected to the awarding of any fees on the basis that the plaintiffs were not the prevailing party. The District Court found that plaintiffs had not succeeded on any of the identifiable issues at trial. Therefore, the Court concluded that the plaintiffs were not prevailing parties under the classic definition of *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Nevertheless, the District Court found that the plaintiffs had "achieved a minor, but recognizable change in the parties' relationships over the course of the eight years of [the] litigation." The Court then awarded plaintiffs' counsel $65,000 in fees and $5,000 in costs because of their catalytic effect in bringing about changes in the parties' relationship. Both sides appealed.

#### 2. *Analysis*

We comprehensively analyzed the issue of fee awards under 42 U.S.C. § 1988 in *Langton.* The decision reviewed there and the decision on appeal here were issued together by Judge Mazzone in a single opinion. Not surprisingly, we have discovered the same infirmities in this case as existed there.

As in *Langton,* the plaintiffs here "did not win on any significant issue in the current litigation and no judgment was entered in their favor." 928 F.2d at 1224. Thus, plaintiffs can not be labeled the prevailing party on the basis of "some bottom-line litigatory success." *Guglietti v. Secretary of HHS,* 900 F.2d 397, 399 (1st Cir. 1990). The critical question here is whether plaintiffs' lawsuit "had a catalytic effect in bringing about a desired result." *Id.*

The mere fact that counsel has litigated a case is, of course, not enough to justify a fee award. That same proposition applies even when counsel has undertaken the case on request of the court. The District Court made two statements that indicate it may have violated this basic proposition. First, "[C]ounsel's presence ... produced a record of continuing dialogue and contact with clients and opposing counsel, which, even if not measurably productive, reflects the day to day work of a lawyer on a case." Second, the judge stated, "I am aware of the time, effort and expense incurred by counsel ... and I recognize and laud the willingness of counsel to serve in cases of this type at the request of the court." Such considerations are purely irrelevant to the analysis of whether plaintiffs' suit had a catalytic effect.

The focus here belongs on identifying the results achieved because of the existence of plaintiffs' suit. The primary objective plaintiffs claim is the existence today of the modified Isolation Policy. The District Court opinion contains only a "limited, and perhaps conflicting characterization" of this issue, similar to its treatment of the double bunking controversy in *Langton.* First, the Court stated that the "plaintiffs achieved a minor, but recognizable change in the parties' relationships over the course of the eight years of this litigation. The most notable change was Judge Young's interim policies." The Court later implied that the Pearson plaintiffs had a role in bringing about this "recognizable" change when it contrasted the efforts of counsel advocating the adequacy of treatment claims: "The *Bruder plaintiffs* spawned no interim order, as in *Pearson.*" (emphasis in original).

Despite the apparent importance of the change, and the implication that plaintiffs' suit was responsible for the change, Judge Mazzone also wrote:

> [I]t was the prescient and wise intervention of Judge Young with regard to the sequestration practice at the Treatment Center which has resulted in the interim policy now in effect. Though *Pearson* counsel sought immediately to enjoin the

promulgation of the revised policies, neither of the plaintiffs' counsel took part in the formation of the final, interim policy, or aided in its drafting. Judge Young did not adopt the suggestions of counsel, but was required, under pressure of time, to forge a sensible and workable course between the positions taken by both sides in this case.

We are at a loss to understand precisely plaintiffs' contributions to bringing about the modified Isolation Policy. If the plaintiffs truly had nothing to do with it, they are not entitled to counsel fees. On the other hand, if plaintiffs did indeed contribute to the spawning of the interim orders, the District Court should have set out both clear findings and the mathematical method it employed to calculate the awarded fee.

We believe a remand to the District Court with instructions for it to clarify these points is required for the same reasons we expressed in *Langton:* the District Court's characterizations of plaintiffs' contributions in modifying the Isolation Policy are confusing and the Court did not spell out how it arrived at the fee award.

## V. CONCLUSION

*For the reasons set forth above, we affirm the District Court's decision on the merits of the sequestration dispute and its resolution of the MPU controversy. The award of fees and costs under 42 U.S.C. § 1988 is vacated. The case is remanded for further proceedings not inconsistent herewith. No costs on appeal.*

*It is so ordered.*

### APPENDIX A

### CONSENT DECREE

This case having come on for hearing on a complaint seeking declaratory and injunctive relief, and the parties having agreed to Paragraph I of Plaintiff's Motion for Summary Judgment, it is declared that, according to Paragraph I of said Motion:

1. The Treatment Center at MCI Bridgewater shall be treated as a facility of the Department of Mental Health.

2. Primary responsibility and authority for the Treatment Center shall be exercised by the Department of Mental Health.

3. All personnel at the Treatment Center (clinical, custodial, administrative) shall be subject to the control of the Commissioner of Mental Health with respect to the handling of patients.

4. Custodial personnel, but not patients, shall be under the administrative, operational and disciplinary control of the Commissioner of Correction.

5. The Department of Mental Health shall exercise the responsibility and authority set forth in subparagraph 2 above so that patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment. To implement this and other provisions of this decree, the Department of Mental Health shall forthwith take steps jointly and in cooperation with the Department of Correction including, as appropriate, seeking legislative funding, to do the following:

a. Improve the physical plant at the Treatment Center....

b. Implement a meaningful work program and increasing avocational activities which may, for those patients so preferring be a substitute for the work program.

c. Have a system of differing security for different categories of patients and modifying the plant if necessary to permit less restrictive conditions for those patients not requiring maximum security.

. . . .

6. [The Departments of Mental Health and Correction] will also act in concert to draw up and promulgate certain rules and regulations to apply to patients at the Treatment Center. The purpose of these rules and regulations shall be to implement the provisions contained in this decree and shall be so drawn and promulgated within one hundred and twenty (120) days of the entry date of this decree.

### APPENDIX B

### SUPPLEMENTAL CONSENT DECREE

This case having come on for hearing on a complaint seeking declaratory and injunc-

tive relief, and the parties having agreed on certain relief as hereinafter indicated, it is hereby declared and ordered that:

1. Defendants shall not use or permit the use of solitary confinement at the Treatment Center at Massachusetts Correctional Institute, Bridgewater, for the purpose of discipline or punishment, disciplinary and punitive procedures having no place in the care and treatment of civilly committed patients.

2. To the extent patients at said Treatment Center are sequestered or segregated by themselves in rooms or cells used at least in part to isolate patients for behavior defendants deem inappropriate and unacceptable.

a) such sequestering or segregation shall be effected in conformity with minimum standards of procedural due process, including notice of the kinds of behavior which may lead to sequestering, notice of particular charges or complaints of such behavior, an opportunity to be heard and confront such charges or complaints and present evidence in rebuttal, a hearing before persons other than the complainant, and notice and a written record of disposition sufficient to permit administrative review.

b) such sequestering or segregation shall be in locations which conform to minimum standards of human decency, including adequate ventilation and heat, clean linen, a table and chair, a place for storage of clothing and belongings, and access to a working sink, toilet and shower sufficient to maintain sanitary conditions and personal hygiene.

This Court does not order the adoption of or specifically approve any particular set of policies and procedures but notes that defendants have adopted certain "Policies and Procedures Concerning Inappropriate and Unacceptable Behavior" (a copy of which is attached as Exhibit "A") which defendants, without objection by plaintiff, deem to be in conformity with the provisions of this Final Decree. The right to amend this decree is retained by the Court. Also there is reserved the right to receive and adjudicate claims for attorneys' fees.

EXHIBIT "A"

POLICIES AND PROCEDURES CONCERNING INAPPROPRIATE AND UNACCEPTABLE BEHAVIOR

The following categories of behavior are inappropriate and unacceptable:

1. Physical violence: assaults, fighting, etc.

2. Any behavior which is provocative or likely to incite or invite disturbances or conflicts including abusive or threatening language or gestures.

3. Wilful damage or disfigurement of any property.

4. Manufacture or possession of any weapon or other dangerous object.

5. Any indication of being under the influence of a non-prescribed medication or drug, including intoxicants, stimulants or depressants; or unauthorized possession of such.

6. Possession of syringes, needles or other medical objects which are not specifically authorized by medical personnel.

7. Violation of any of the General Laws of the Commonwealth constituting a criminal act which may subject the offender to prosecution in a court of the Commonwealth.

Officers are authorized, in their discretion, to sequester temporarily any patient whose behavior falls within one of the above categories, where there is a clear and present danger of physical harm from such patient to others or to himself.

The senior clinical person on call shall be immediately notified of the sequestration of any patient and shall promptly investigate the basis therefor. He may release the patient forthwith with return to his usual prerogatives; he may conditionally release the patient subject to further clinical inquiry or he may order continued detention until a special clinical staff conference is convened at the earliest possible moment and in any case, within 72 hours of the sequestration in order to consider and resolve the problem.

The purpose of the special clinical staff conference shall be to insure procedural due process and specifically to insure that any restrictions which have been or may be imposed shall be demonstrably fair and in the best interest of both the patient and the general body of patients.

At the earliest possible moment, and before the staff conference, the patient shall be provided with a copy of the officer's description of the alleged inappropriate behavior together with notice of the scheduled time of the conference and a copy of this "Policies" document. The patient may request the assistance of fellow patients, staff members, including his therapist, or others.

At the staff conference the patient shall have a full opportunity to explain or otherwise present his version of the alleged inappropriate behavior. The complaining officer shall be present if the patient so requests. The patient may present witnesses to provide their versions of the alleged incident, may present additional information as he wishes and may question any person providing information as to such incident. In addition he may designate any person from among patients or staff to present any material which may be germane to the problem.

The following staff members or their designee shall conduct the conference:
1. The Acting Director or his Deputy[;]
2. The Head Administrative Assistant or the Administrative Assistant;
3. The Senior Psychiatrist or the Chief Psychologist.

No party to or complainant of the alleged inappropriate behavior shall participate in the deliberation or decision of the convened staff.

The patient's therapist shall be available to the staff for consultation but shall not participate in the meeting unless specifically designated by the patient.

The patient shall be interviewed in accordance with established clinical practice. The procedure shall be clinical in form, substance and spirit. It shall be cause-finding but not fault-finding.

At the conclusion of the interview, the patient shall be excused from the meeting and the staff shall formulate a treatment plan which may or may not include continued sequestration. If no further sequestration is indicated, the patient shall be promptly returned to the general community of patients with or without limitations as clinical considerations may indicate. Should sequestration be included in the treatment plan, the patient shall be so informed promptly with clear explanation of the reasons for such and he shall receive a written memorandum of the reasons for such within 24 hours.

In no case may sequestration be extended beyond seven days unless an additional staff conference has been convened prior to the termination of the period and conducted in the manner described above for the initial convening.

All decisions shall be made subject to appeal in writing to the Acting Director.

A record shall be made of all proceedings including the report of the officer, the response of the patient, data elicited in the clinical examination and the formulated treatment plan. The supplementary record shall describe the patient's response to treatment, any subsequent measures that may be taken, and the final resolution of the incident.

The record shall identify by name all participants in the procedure and shall specifically identify the responsible staff members of the conference.

Any patient in sequestration shall be seen daily by the Deputy Acting Director, the Head Administrative Assistant, or other staff authority, and shall have daily, regular, formal treatment, or offer of such, by his scheduled therapist or an alternate.

For purposes of formal treatment, the patient shall be permitted to leave the restricted room or area, and treatment shall be conducted in accordance with usual practice in a therapy room on the treatment corridor unless the patient's clinical condition indicates that he is acutely dangerous to himself or others in which case treat-

ment shall be provided in close proximity to the restricted area.

Any sequestered patient shall have available to him reading and writing materials, radio or television if he owns such, other recreational material—all provided there are no safety contraindications. Communication, including mail, shall not be restricted. Visits by relatives and friends shall not be restricted unless it has been clinically determined that such would be against the patient's best interest. Appropriate periods for exercise and smoking and other indulgences shall be provided.

Since punishment in any guise or form has no place in any program of treatment nor in any mental health facility, every effort shall be made to insure that neither punishment nor the appearance of such shall be any part of sequestration.