Ann B. LOVELL, et al., Plaintiffs,

v.

PEOPLES HERITAGE SAVINGS BANK, et al., Defendants.

Civ. No. 88-0059-P.

United States District Court, D. Maine.

Oct. 15, 1991.

Richard E. Poulos, Portland, Me., for Ann B. Lovell, et al., plaintiffs.

Peter J. DeTroy, III, Portland, Me., for Robert A. Marden, defendant.

George S. Isaacson, Lewiston, Me., for Weston L. Bonney, defendant.

Thomas D. Warren, Deputy Atty. Gen., Augusta, Me., for Donald H. Dematteis, defendant.

Ralph I. Lancaster, Jr., Portland, Me., for Peoples Heritage Sav. Bank, defendant.

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

In this action arising from the conversion of Peoples Heritage Bank from a mutual savings bank to a stock savings bank, Plaintiffs have asserted both federal and state claims against the Defendants. The federal claims, which allege constitutional violations and are brought under 42 U.S.C. § 1983, are set forth in Counts I, II, and III. In Count I Plaintiffs allege that the conversion of Peoples Heritage deprived them of their ownership interests in the bank in violation of the Due Process and Contract Clauses of the United States Constitution. In Count II Plaintiffs allege that the conversion of Peoples Heritage violated the Equal Protection Clause of the Constitution because the account holders of Peoples Heritage were treated differently in the conversion than were policy holders of Union Mutual, a Maine mutual insurance company that converted to stock ownership shortly before the Peoples Heritage conversion. Count III alleges that the enactment and application to Plaintiffs of 9–B M.R.S.A. § 344(3) deprived them of their rights to vote on the conversion. That statute enacts a presumption that account holders who do not vote on the conversion by appearing at a special meeting or by submitting a written ballot have voted in favor of it. Defendants Peoples Heritage, and Weston Bonney and Robert Marden, respectively the President and Chairman of the bank's Board of Directors at the time of conversion, have moved for summary judgment on the federal claims, arguing that they are not state actors and therefore cannot be liable under 42 U.S.C. § 1983. They also seek summary judgment on or dismissal of Counts II and III on the grounds that those counts do not set forth federal constitutional claims.

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–59, 106 S.Ct. at 2510–11. *Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989).

## Count I

Plaintiffs claim in Count I that they were deprived of their property rights in Peoples Heritage in violation of 42 U.S.C. § 1983, the Fourteenth Amendment and the Contract Clause of the United States Constitution. Since the Constitutional prohibitions and section 1983 do not reach private actions, the first issue to be addressed by the Court is whether Peoples Heritage's alleged conversion to stock ownership without just compensation to account holders constituted action which may be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982); *Ponce v. Basketball Federation,* 760 F.2d 375, 377 (1st Cir.1985). The Supreme Court has delineated a two-part approach to this inquiry:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753–54. In conducting its analysis the court must "sift[ ] facts and weigh[ ] circumstances" for that is the only way that "the nonobvious involvement of the State in private conduct can be attributed its true significance." *Burton v. Wilmington Park-*

*ing Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

In this case the record shows that in 1986 Defendants decided they wanted to effect the conversion of Peoples Heritage from mutual to stock form. They sought and received information from the Bureau of Banking concerning the planned conversion. The record also shows that before filing a formal application Defendants called the Bureau of Banking and met with the Superintendent and some of his staff. On August 26, 1986 the Bank's Board of Directors approved the conversion plan. Pursuant to 9–B M.R.S.A. § 344, on September 10, 1986, the Bank presented its application for conversion to the Maine Bureau of Banking for review and approval. Draft portions of the conversion plan had been presented to the Bureau for comments before the application was formally submitted. The Superintendent issued his approval of the confirmation plan on October 22, 1986. Informational meetings for depositors to learn about the conversion plan were held throughout the state in November. Bureau officials were present at some of the meetings. As required by statute a meeting was held on November 26, 1986 to allow the account holders to vote on the proposed conversion. The meeting was attended by a very small number of persons. Ballots had been sent to account holders, allowing them to vote for or against the conversion. The ballot informed the account holders that all unreturned ballots would be treated as votes in favor of the conversion, in accordance with Maine law, 9–B M.R.S.A. § 344(3). Only 3,701 of the approximately 119,000 account holders voted on the conversion plan either in person or by ballot. Of those, 3,199 voted in favor and 502 against the plan. A certificate of conversion was issued by the Bureau on December 11, 1986.

The most important "facts" for purposes of this motion are the Maine statutes and regulatory framework surrounding bank conversions like the one at issue here. Maine law allows conversion only with the approval of the Superintendent of Banking and in accordance with the provisions of the conversion law. 9–B M.R.S.A. § 344.

Conversion is only permitted if it is "conducted in a manner equitable to all parties thereto." *Id.* The conversion plan adopted by a bank must *inter alia* "insure that the interests of depositors and account holders in the net worth of the institution are equitably provided for...." *Id.* at § 344(1).

Plaintiffs allege that Defendants became state actors because they utilized state procedures, statutes and guidelines as well as decisions and orders of state officials in order to accomplish the taking of Plaintiffs' property. Plaintiffs also allege that Defendants acted jointly with the Banking Superintendent, John DeMatteis, and that DeMatteis gave substantial assistance and encouragement to the conversion as planned by Defendants.

■ Defendants argue that the mere fact they are in a highly regulated business does not mean that they become state actors. That proposition is correct, but it is not the end of the inquiry. In their memorandum in support of the motion, Defendants cite *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), as dispositive of this case. In *Moose Lodge* appellee Irvis, a black man, was refused service by Moose Lodge, a local branch of a national fraternal organization. Irvis sued under section 1983 for violation of his constitutional rights, claiming that "because the Pennsylvania liquor board had issued appellant Moose Lodge a private club license that authorized the sale of alcoholic beverages on its premises, the refusal of service to him was 'state action' for the purposes of the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 165, 92 S.Ct. at 1967–68. Summarizing its prior holdings, the Court explained that for a finding of state action, "the impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination...." *Id.* at 172, 92 S.Ct. at 1971. "[W]here the impetus for the discrimination is private, the State

must have 'significantly involved itself with invidious discriminations' ... in order for the discriminatory action to fall within the ambit of the constitutional prohibition." *Id.* at 173, 92 S.Ct. at 1971. Although Moose Lodge may have been heavily regulated, the Court noted that the regulator was not involved in establishing or enforcing the discriminatory membership and guest policies of the Lodge. *Id.* at 175, 92 S.Ct. at 1972. Because, with one exception, the regulatory scheme enforced by the State did not implicate the State in the challenged discriminatory guest policies, the Court found that Moose Lodge was not a state actor within the ambit of the Constitution's Equal Protection clause. *Id.* at 177, 92 S.Ct. at 1973.

This case is different from *Moose Lodge* in certain important respects. In *Moose Lodge* the Court specifically distinguished *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), in which "the regulatory agency had affirmatively approved the practice of the regulated entity after full investigation," finding that the Pennsylvania Liquor Control Board "has neither approved nor endorsed the racially discriminatory practices of Moose Lodge." *Moose Lodge*, 407 U.S. at 175 n. 3, 92 S.Ct. at 1973 n. 3.[1] In this case, the state statute requires the Superintendent to examine a bank's conversion plan in all respects and determine, among other things, if it provides equitably for the interests of account holders and depositors. *See* 9–B M.R.S.A. § 344(2). Thus, the Superintendent was required by statute affirmatively to review the confirmation plan for its fairness. If the plan were unfair or inequitable to the depositors or account holders, even at a subconstitutional level, the Superintendent was able to, and indeed required to, disapprove it or to seek modification of it until it was fair.

In *Moose Lodge* the Court found one instance in which the regulator did establish or enforce the discriminatory policies of the club which it licensed. The state

---

**1.** The Court realizes that the Supreme Court has, more recently, questioned whether *Pollak* is binding precedent for state action analysis. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 356 and n. 16, 95 S.Ct. 449, 456 and n. 16, 42 L.Ed.2d 477 (1974). As will be discussed in the text, however, the Court in *Jackson* again distinguished *Pollak* in an instructive manner.

licensing regulations required that every club licensee abide by its constitution and bylaws. Since the constitution and bylaws of Moose Lodge were discriminatory, the Court found that the effect of the regulation was to invoke the sanctions of the State to enforce a concededly discriminatory private rule in violation of the Fourteenth Amendment. The Court therefore enjoined enforcement of that regulation. *Id.* at 178–79, 92 S.Ct. at 1974. This case presents a variant of that situation. For here, if the conversion plan is unfair, in a constitutional or any other sense, the State can and is supposed to keep it from going into effect.

The Supreme Court again considered the state action question in the context of regulated businesses in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449 (1974). In *Jackson* Petitioner was a customer of Respondent electric company whose account was terminated for nonpayment. Because the heavily regulated electric company had filed with the Pennsylvania Public Utility Commission a general tariff allowing termination of service for nonpayment, Petitioner argued that the termination of her electric service constituted state action. The Supreme Court disagreed, reaffirming that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id.* at 350, 95 S.Ct. at 453. Rather the Court said that "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453–54.

The Court in *Jackson* also rejected the argument that the utility's termination of service was state action because the State "specifically authorized and approved" the termination practice filed with the general tariff. *Id.* at 354, 95 S.Ct. at 455. Examining the facts of the case, the Court determined that the termination provision had never been the subject of a hearing or other scrutiny by the Commission, and that it had become effective merely by not be-

ing disapproved. *Id.* at 354–55, 95 S.Ct. at 455–56. The Court noted as a threshold matter that it was less than clear that the utility was even required to file the disputed provision as part of its tariff or that the regulatory agency would have had the power to disapprove it. The District Court had described the filing as a simple notice filing. *Id.* at 355, 95 S.Ct. at 456.

Petitioner in *Jackson* had relied heavily on *Pollak*, in which the Court had dealt with the contention that the Washington bus system's piped music system violated riders' First Amendment rights. The Court sharply distinguished *Pollak* from the case of the electric utility then before it:

> [T]he nature of the state involvement there was quite different than it is here. The District of Columbia Public Utilities Commission, on its own motion, commenced an investigation of the effects of the piped music, and after a full hearing concluded not only that Capital Transit's practices were "not inconsistent with public convenience, comfort, and safety," ... but also that the practice "in fact, through the creation of better will among passengers, ... tends to improve the conditions under which the public ride." Here, on the other hand, there was no such imprimatur placed on the practice of Metropolitan about which petitioner complains.

*Id.* at 356–57, 95 S.Ct. at 456–57.

In contrast to the situation presented in *Jackson*, in this case there is no question that the bank's conversion plan had to be presented to and affirmatively approved by the state. Moreover, the Superintendent's role in this case, as mandated by statute, is far closer to that of the regulatory body in *Pollak* than to the passive role ascribed to the regulators in *Jackson*. Specifically, the Maine statute requires the Superintendent to examine the conversion plan in detail to determine whether it is equitable to all parties and if necessary to hold public hearings "to determine whether the plan provides fair and equitable treatment to the depositors." 9–B M.R.S.A. § 344(2)(B). The statute, therefore, requires that the

state put its imprimatur on the conversion plan by publicly assuring its fairness. While the bank may make the initial decision concerning the manner in which it wishes to convert, without the state's considered imprimatur, the bank may not effect its conversion.[2]

In the same term that it decided *Lugar,* the Supreme Court also heard two other cases concerning heavily regulated defendants. In *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), a class of Medicaid patients challenged decisions of the nursing homes in which they resided to discharge or transfer them to a lower level of care without certain procedural safeguards. In contrast to this case the only Defendants were state officials, and the suit sought to hold the state officials responsible for the decisions of private nursing homes in discharging or transferring patients, alleging that the decisions were encouraged under the extensive state and federal regulations covering nursing homes. *Id.* at 1003, 102 S.Ct. at 2785. The Court held that, on the record before it, the state could not be held responsible for the nursing homes' decisions about particular patients, explaining that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.* at 1004–05, 102 S.Ct. at 2785–86. Defendants here argue that Peo-

ples Heritage's connection with the State is more attenuated than the private party-State nexus described in *Blum.*

In *Blum,* although State regulations required nursing homes to complete State-formulated patient care assessment forms at the time of discharge to a different care level and forward them to the receiving facility, the Supreme Court made explicit that the nursing homes were not required to rely on the forms in making particular transfer or discharge decisions: "Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008, 102 S.Ct. at 2788.[3] Here the private decision of the bank concerning the nature of the conversion could not be put into effect unless it conformed with standards of fairness determined by the State through its agent the Superintendent.

As a final alternative argument in *Blum,* the respondents urged that there was state action because even if the State did not command the transfers at issue, it reviewed and either approved or rejected them on the merits. The Court found that the record did not support that argument because "nothing in the regulations authorizes the officials to approve or disapprove decisions either to retain or discharge particular patients...." *Id.* at 1010, 102 S.Ct. at 2789.[4] Here the statute explicitly re-

**2.** In fact, the statute contemplates that if the superintendent finds a conversion plan inequitable and disapproves it, he must give his reasons and the bank can then modify the plan to obviate the reasons for the disapproval. *Id.* at § 344(2)(C). Thus, to a certain extent, the statute envisions a joint undertaking in which the private actor, the bank, devises the conversion plan but is aided, if necessary, in making it fair and equitable by the Superintendent.

**3.** In *Blum,* the Petitioners also sought to base their claims that the transfer decisions constituted state action on the existence of State regulations which penalized nursing homes that failed to discharge patients whose continued stay was deemed inappropriate by the State. The Court rejected the claim, stating: "[T]hose regulations themselves do not dictate the decision to discharge or transfer in a particular case." *Id.* at 1010, 102 S.Ct. at 2789. In this case, the Superintendent did not formally promulgate regula-

tions governing conversion from mutual to stock form. If regulations existed in this case, in contrast to *Blum,* the nature of the conversion plan would be dictated by the regulations because the conversion could not be approved unless it complied with the regulations. 9–B M.R.S.A. § 344.

**4.** In the other state action case decided by the Supreme Court during the same term as *Lugar,* the Court found no state action in the discharge of teachers from a private school which was heavily funded and regulated by the State. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The Court stated:
Here the decisions to discharge the petitioners were not compelled or even influenced by any state regulation. Indeed, in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters. The most intrusive personnel regulation

quires the Superintendent to approve or disapprove the specific provisions of a particular conversion plan.[5]

In *Ponce v. Basketball Federation,* 760 F.2d 375, the Court of Appeals for the First Circuit relied on *Blum* to find no state action in a suit by a basketball player challenging the constitutionality of his suspension under the eligibility rules of the defendant basketball federation. Plaintiff Ponce alleged that Puerto Rico's extensive regulation of amateur basketball and its financial support of the Federation and League teams established a close enough nexus between the state and the challenged action so that the action could be treated as that of the state. *Id.* at 377. The court found that the record failed to identify any affirmative state action as required in *Blum. Id.* at 379. The court stated, however, that "[h]ad Ponce produced evidence of pre-litigation action taken by the state showing that the Secretary [of the Commonwealth of Puerto Rico's Department of Sports and Recreation] shared responsibility for the promulgation or enforcement of the eligibility standards or that he officially or formally adopted or approved them, we might well have a different case." *Id.* This Court is faced with that different case since the Superintendent of Banking officially and formally approved the allegedly unconstitutional conversion plan.

As the Supreme Court stated in *Lugar:* "Action by a private party pursuant to [a] statute, without something more, [is] not sufficient to justify a characterization of that party as a state actor." *Lugar,* 457 U.S. at 939, 102 S.Ct. at 2754–55. At oral argument Defendants suggested that only cases involving regulation of private entities were pertinent to the state action analysis to be undertaken here. As the foregoing discussion indicates, however, this case is significantly distinguishable from the regulatory cases relied upon by Defendants. While the cases relied upon by Defendants thus provide useful guidance, the Court also finds Supreme Court teachings in other areas of state action analysis helpful in its attempt to discern the "something more" required for a finding of state action.[6]

In *Lugar* the Supreme Court addressed a claim that Respondent's use of Virginia's prejudgment attachment procedure deprived Petitioner of his property without due process of law. The writ of attachment was issued on an *ex parte* petition by the clerk of the state court and was then executed by the county sheriff. *Lugar,*

---

promulgated by the various government agencies was the requirement that the Committee on Criminal Justice had the power to approve persons hired as vocational counselors. Such a regulation is not sufficient to make a decision to discharge, made by private management, state action. *Id.* at 841–42, 102 S.Ct. at 2771–72. Here, of course, the regulators were required by statute to concern themselves with the fairness of the bank's conversion plan.

5. Defendants urge the Court to find that the decision whether or not to convert is solely a private one and that the Superintendent has no control over that business decision. The Supreme Court has made clear that "[f]aithful adherence to the 'state action' requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint." *Blum,* 457 U.S. at 1003, 102 S.Ct. at 2785. Count I does not challenge the basic decision to convert to stock ownership; it challenges the conversion plan for its alleged failure to provide compensation to account holders for what Plaintiffs have claimed as their property interest in the net worth of the bank. While the

decision to convert was clearly a private business judgment, as discussed in the text, the nature of the conversion plan is much more dependent on the judgment and policy of the State.

6. This Court had occasion to perform a similar analysis in the nonregulatory case of *Hudson v. S.D. Warren Co.,* 665 F.Supp. 937 (D.Me.1987). In that case Plaintiff, an employee of Defendant, was fired as the result of an undercover operation planned and executed by the Maine State Police and private Defendant, S.D. Warren. The Court there made clear that "an agreement with the state to do what a private person already has the legal authority to do simply does not, by itself, transform the private action into state action." *Id.* at 939. Although the context of *Hudson* differs from that in this case, which deals with a pervasive regulatory setting, the conclusion is analytically useful. While in *Hudson* the private company had the power to fire Plaintiff, Peoples Heritage did not, by itself, have the unqualified legal authority to convert. It required something more, specifically the state's review and approval of its conversion plan.

457 U.S. at 924, 102 S.Ct. at 2747. The Court found that the invocation of the aid of state officials to take advantage of state-created attachment procedures constituted state action. *Id.* at 941. The Court made clear it was not holding that a private party's mere invocation of state legal procedures was enough to meet the requirements of section 1983. *Id.* at 939 n. 21. In this case, of course, Peoples Heritage could not just avail itself of the statutory right to convert. The statutory structure is such that without the participation of the Superintendent, the bank could not convert. Thus, any deprivation of Plaintiffs' property was the result of the joint participation of the bank and the Superintendent of Banking, who effected the conversion just as the sheriff effected the attachment in *Lugar.*

The Court in *Lugar* limited its holding to the particular context of prejudgment attachment. *Lugar,* 457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21. Citing *Lugar* in a more recent non-attachment case, however, the Court has said "when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 486, 108 S.Ct. 1340, 1345, 99 L.Ed.2d 565 (1988). In *Pope* the Supreme Court had to determine whether the State's involvement with Oklahoma's probate nonclaim statute is substantial enough to constitute state action in a suit brought by the creditor of an estate against the executrix of the estate. *Id.* The Court explained that when a defendant seeks to bar a claim under a general statute of limitations, which is self-executing, there is no state action:

> The State has no role to play beyond enactment of the limitations period. While this enactment obviously is state action, the State's limited involvement in the running of the time period generally falls short of constituting the type of state action required to implicate the protections of the Due Process Clause.

*Id.* at 486–87, 108 S.Ct. at 1345–46. In contrast, the Court found significant state action when a private party seeks to bar a claim with the probate nonclaim statute. As the Court stated, "[t]he probate court is intimately involved throughout, and without that involvement the time bar is never activated." *Id.* at 487, 108 S.Ct. at 1345–46. The Court explained that probate proceedings must commence in state court, the court must appoint the executor or executrix, and a routine court order requires the executor or executrix to give notice to creditors and file a copy with the court.

> It is only after all of these actions take place that the time period begins to run, and in every one of these actions the court is intimately involved. This involvement is so pervasive and substantial that it must be considered state action subject to the restrictions of the Fourteenth Amendment.

*Id.*

This case presents an even more compelling instance of state action than that described in *Pope.* The conversion process is not self-executing in any respect. Moreover, the Bureau of Banking is more intimately involved in a bank's conversion than is the court in an executor's or executrix's use of the nonclaim statute because it must ultimately decide on the fairness of the conversion plan. Clearly, as with the nonclaim statute, without the state's involvement the alleged deprivation could not occur.

While not as directly apposite as the previously discussed cases, the Supreme Court's most recent teaching on state action does not alter this Court's view of the situation presented here. In *Edmonson v. Leesville Concrete Co., Inc.,* —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), a personal injury case, the Defendant used its peremptory challenges to remove black persons from the prospective jury. Again applying the *Lugar* two-part test, the Court held, as an initial matter, that the exercise of peremptory challenges by a private party constitutes state action. First, in *Edmonson,* the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority. Peremptory challenges are created by statute and can be exercised only

when the government, by statute or decisional law, deems it appropriate to allow parties to exclude from the jury persons who would otherwise qualify for such service. *Id.* at ——, 111 S.Ct. at 2082–84. As the Court stated: "Without this [statutory] authorization, granted by an Act of Congress itself, Leesville would not have been able to engage in the alleged discriminatory acts." *Id.* Similarly, in this case the bank could not effect the alleged constitutional violation without having statutory authorization. The Legislature has decreed that the business of all Maine financial institutions shall be supervised by the Bureau of Banking, 9–B M.R.S.A. § 111, and in section 344 the Legislature has specified under what circumstances conversion will be allowed.

The Supreme Court went on in *Edmonson* to decide if Defendants met the second part of the *Lugar* test, *i.e.*, whether the private party charged with the deprivation could be described in all fairness as a state actor. Finding that a private party could not exercise its peremptory challenges absent the overt, significant assistance of the state, acting through the court, the Court explained:

> The party who exercises a challenge invokes the formal authority of the court, which must discharge the prospective juror, thus effecting the "final and practical denial" of the excluded individual's opportunity to serve on a petit jury. *Virginia v. Rives*, 100 U.S. 313, 322 [25 L.Ed. 667] ... (1880). Without the direct and indispensable participation of the judge, who beyond all question is a state actor, the peremptory challenge system would serve no purpose. By enforcing a

discriminatory peremptory challenge, the court "has not only made itself a party to the [biased act], but has elected to place its power, property and prestige behind the [alleged] discrimination." *Burton v. Wilmington Parking Authority*, 365 U.S. at 725 [81 S.Ct. at 861–62.] In so doing, the government has "create[d] the legal framework governing the [challenged] conduct," *National Collegiate Athletic Assn. [v. Tarkanian]*, 488 U.S. [179] at 192 [109 S.Ct. 454 at 462, 102 L.Ed.2d 469] and in a significant way has involved itself with invidious discrimination.

*Id.* at ——, 111 S.Ct. at 2084–86. Similarly here, the Superintendent effects the conversion, which allegedly has deprived Plaintiffs of their property. The State, having created the legal framework governing the challenged conduct, has, through the Superintendent's review and approval, made itself a party to the alleged deprivation, placing its power and prestige behind the alleged deprivation with the issuance of the certificate of conversion.[7]

In *Edmonson* the Supreme Court also considered whether the action in question, there the exercise of peremptory challenges, involved the performance of a traditional function of government. The Court found that although most aspects of the conduct of a civil case do not have a governmental character, the exercise of peremptory challenges is an important function within the government. *Id.* at ——, 111 S.Ct. at 2086–88. In the regulatory context, however, the Supreme Court has consistently declined to find that "all businesses 'affected with the public interest'" are performing traditional functions of government and are thus state actors in all

---

7. The Supreme Court in *Edmonson* also considered other factors to determine whether the second *Lugar* test was met. Specifically, it addressed whether the Defendant was performing a traditional public function and whether the constitutional injury was aggravated by the incidents of governmental authority. The Court found that all three factors were present. Although the Court has articulated a number of different factors or tests throughout the years, including the public function test, a joint action test, a state compulsion test, and the regulatory nexus test, *see Lugar*, 457 U.S. at 939, 102 S.Ct. at 2754–55, it has not required the meeting of all of them for a finding of state action. *See, e.g., Tulsa Collection Services v. Pope*, 485 U.S. at 487, 108 S.Ct. at 1345–46; *Lugar*, 457 U.S. at 942, 102 S.Ct. at 2756. In fact, the Court in *Lugar* queried, but did not resolve, "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation." *Id.* The following discussion indicates the blurring that occurs at the edges of some of the tests.

their actions. *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 353, 95 S.Ct. at 455. For example, it found that the utility company in *Jackson* was not performing a traditional governmental function despite the fact that it was statutorily-required to provide service, because nowhere was the obligation to provide electric service imposed on the State. *Id.* The Court in *Rendell–Baker v. Kohn* explained that the proper question is whether the function performed has been "traditionally the *exclusive* prerogative of the State." *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. at 2772.

■ Banks are somewhat different from other regulated corporations which might provide essential goods and services, "affected with the public interest." A mutual savings bank, like Peoples Heritage, is a "creature of the Legislature. All powers which it can lawfully exercise are prescribed by its charter and by statute." *Androscoggin County Savings Bank v. Campbell*, 282 A.2d 858, 862 (Me.1971). Clearly, the running of a bank is not currently a function of government in the same sense that selection of a jury is, and most of the decisions made are private business decisions. Protecting the public through extensive bank regulation is, however, a traditional function of the government. *Craughwell v. Mousam River Trust Co.*, 113 Me. 531, 534, 95 A. 221 (1915). In the conversion context the state has specifically carved out for itself the role of determining that any change in bank ownership will be conducted in a manner equitable to all parties, and the conversion cannot occur unless that criterion is met. 9–B M.R.S.A. § 344.

Section 344 contemplates that the bank and the State will work together to perform the state's governmental, regulatory function of assuring the fairness of the conversion. Subsection 344(1) requires a mutual financial institution wishing to convert to adopt a conversion plan "which shall insure that the interests of depositors and account holders in the net worth of the institution are equitably provided for." Of course, the statute also builds in a regulatory check, requiring the approval of the Superintendent, with his underlying determination of fairness. If the bank fails to draft an acceptable conversion plan, the Superintendent may suggest modifications to make it acceptable. Just as litigants exercising peremptory challenges are serving an important function within the government and acting with its substantial assistance, *Edmonson*, —— U.S. at ——, 111 S.Ct. at 2086–88, banks drafting conversion plans are in a limited sense also called upon to perform the government's protective function by preparing plans that meet the statutory fairness requirements. Thus, any constitutional injury to depositors could be considered the result of the state's partial delegation of its appointed task of assuring fairness and its participation with the bank in performing that task. *See, id.*

Banks in Maine have historically been entwined with the State in a close regulatory nexus that continues to this day. That regulatory web, unlike those in the regulatory state action cases addressed by the Supreme Court, catches within it the assertedly private decision challenged in this case. Without the State's detailed scrutiny and express approval, publicly attesting to the fairness of its plan, Peoples Heritage could not have converted. Because of the State's pervasive and substantial involvement with the very aspect of the conversion challenged here, it is fair to deem the private bank defendants in this case government actors for their conduct regarding the challenged conversion plan, *see Lugar*, 457 U.S. at 937, 102 S.Ct. at 2754, and the conversion must be considered state action subject to the restrictions of the Constitution.[8] *See Tulsa Professional*

---

**8.** In *NCAA v. Tarkanian*, 488 U.S. 179, 194 n. 14, 109 S.Ct. 454, 463 n. 14 (1988), the Supreme Court noted that "[a]lthough by no means identical, analysis of the existence of state action justifying immunity from antitrust liability is somewhat similar to the state-action inquiry conducted pursuant to § 1983 and the Fourteenth Amendment." As the Court of Appeals for the First Circuit has recently articulated the test, state action immunity "exists if (1) the private parties' conduct was undertaken pursuant to 'clearly articulated and affirmatively ex-

*Collection Services v. Pope,* 485 U.S. at 487, 108 S.Ct. at 1345–46. The Court does not by this holding determine that there has been a constitutional violation alleged by Count I, and it recognizes that there are serious issues concerning whether the preconversion account holders had a property interest in the bank's net worth.

### Count II

■ In Count II Plaintiffs assert a denial of equal protection because they "were denied the rights and protections accorded to owners of mutual institutions generally when they dissolve and in particular the rights and protections accorded to policy holders of mutual insurance companies when they dissolve through conversion." Specifically, Plaintiffs allege that they should have been treated like the policy holders of Union Mutual, a Maine mutual insurance company which converted under the provisions of 24–A M.R.S.A. § 3477. Plaintiffs allege that the Superintendent of the Bureau of Insurance required that the net worth of the Union Mutual be distributed to the policy holders at the time of conversion to insure that policy holders were treated in a fair and equitable manner.

The Court of Appeals for the First Circuit has recently described the equal protection analysis in which this Court must engage:

The equal protection clause seeks to ensure that similarly situated people are treated alike. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439 [105 S.Ct. 3249, 3254, 87 L.Ed.2d 313] (1985). It " 'does not require things

which are different in fact or opinion to be treated in law as though they were the same.' " *Plyler v. Doe,* 457 U.S. 202, 216 [102 S.Ct. 2382, 2394, 72 L.Ed.2d 786] (1982) (*quoting Tigner v. Texas,* 310 U.S. 141, 147 [60 S.Ct. 879, 882, 84 L.Ed. 1124] (1940)). The Supreme Court has stated that:

The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose. *Plyler,* 457 U.S. at 216 [102 S.Ct. at 2394.]

*Pearson v. Fair,* 935 F.2d 401, 411 (1st Cir.1991). Defendants argue that even if the private defendants can be considered state actors for purposes of this motion, there is no denial of equal protection here because depositors in banks are not situated similarly to policy holders of mutual insurance companies. The Court agrees.

The Maine Legislature has decided to regulate insurance companies and banks separately and has enacted a separate and unitary statutory scheme governing each of those business categories. *Compare* 9–B M.R.S.A. §§ 111 *et seq.* with 24–A M.R.S.A. §§ 1 *et seq.* There are separate

pressed' state policies to displace competition, and (2) the anticompetitive activity was 'actively supervised' by the respective states." *New England Motor Rate Bureau, Inc. v. Federal Trade Commission,* 908 F.2d 1064, 1069 (1st Cir.1990). If, as the Supreme Court suggests, the state action immunity test might be instructive in section 1983 state action cases, it seems likely that after accounting for the different context, the facts here would meet the test for state action immunity as well. As the Court said in *New England Motor Rate Bureau:*

In summary, the statute here clearly calls for the active supervision of the rates filed. We

know, further, that a regulatory agency has been established and funded to carry out that statutory mandate, and that state officials are positioned to carry out their statutory duties. Furthermore, the stipulations in the case indicate that unreasonable rates will be rejected and that the failure to suspend or reject a rate indicates a determination that the rate has been found to meet the regulatory criteria.... Specifically, Massachusetts both *has* and *exercises* relevant regulatory power.

*Id.* at 1077.

and distinct conversion laws for mutual savings banks and for mutual insurance companies. *Compare* 9–B M.R.S.A. § 344 and 24–A M.R.S.A. § 3477. The insurance conversion law provides that the superintendent shall not approve any conversion plan unless it is fair and equitable. 24–A M.R.S.A. § 3477(2)(A). It further details certain specific provisions that the plan must contain, including one for payment to each member of his entire equity share in the insurer, with that payment to be made in cash or to be applied to the purchase of stock. *Id.* at § 3477(2)(G). As discussed previously, the bank conversion statute requires that the interests of the depositors and account holders in the net worth of the institution be equitably provided for. 9–B M.R.S.A. § 344(1). It does not specify how that should be accomplished, leaving assurance of the goal to the Superintendent's oversight.

■ It is plain that the Maine Legislature, in which such discretion resides, has determined that the insurance business is different from the banking business for purposes of general regulation and specifically for regulation of conversions from mutual to stock institutions. The Court, then, must determine whether the classification at issue bears some fair relationship to a legitimate public purpose.[9]

■ The Maine Law Court has long recognized the unique position occupied by banks in Maine's financial structure.

[A] bank is not merely a private institution. It is in a very important sense a public institution, in that the public are deeply concerned in its well being.... The general well being of the public is affected by the success or the downfall of the banks which feed the arteries of business.

Because banking institutions have a public character, and because the public is so affected by their management, good or bad, the state has ever found it expedient closely to supervise their operations, to throw around them safeguards on the one hand, and limitations of power on the other, all for the purpose of protecting the public. They are not legislated for or against like other corporations, ... *but are put into a class by themselves....*

*Craughwell v. Mousam Trust Co.,* 113 Me. at 534, 95 A. 221 (emphasis added). This explanation of the State's separate regulatory system for banks is entirely rational.

Moreover, given the constant, close supervision of bank operations and the banking field desired by the Maine Legislature, it is equally rational to employ a statutory scheme which allows the Superintendent flexibility in determining whether a conversion plan is equitable. Even if bank regulation parallels that of the insurance industry to some degree, it need not be identical. *See, Pearson,* 935 F.2d at 412 n. 19 ("Even if the Commonwealth legislatively chose to have similar commitment processes for two distinct groups, that would not constitu-

**9.** Plaintiffs argue that the rational basis test should not apply in this case, but rather that the legislative classification should be subjected to heightened scrutiny. The bank conversion law is a form of economic regulation. Economic regulation has traditionally been subjected to the minimum rationality test described in the text. *See, e.g., Exxon Corp. v. Eagerton,* 462 U.S. 176, 196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983); *see also* L. Tribe, *American Constitutional Law,* at 1445 and n. 21 (1988). As the Court of Appeals for the First Circuit has said: "Government can impose reasonable conditions on the conduct of business and on working arrangements. Unless other factors intrude, say race or ethnicity, state regulation must be analyzed under the rational basis test." *Montalvo–Huertas v. Rivera–Cruz,* 885 F.2d 971, 977 n. 8 (1st Cir.1989). Plaintiffs here assert that height-

ened scrutiny is required because their entitlement to property, a fundamental right, is burdened by the challenged conduct. While strict scrutiny of legislative classifications which distribute benefits and burdens in a manner inconsistent with fundamental rights is required, *id.* at 976, it is plain that even if the kind of state-created property interest which Plaintiff seeks to protect exists, it does not give rise to strict scrutiny. As the Court said in *Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 407–08, 96 L.Ed. 469 (1952):

Of course many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity. Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization.

tionally bind it to have similar sequestration policies.") Thus, the bank conversion law is not irrational because it fails to prescribe the specific elements of an equitable conversion while the insurance code does prescribe them for a conversion in that field. The Court is satisfied, therefore, that Plaintiffs have not adequately alleged a claim for denial of their equal protection rights.

### Count III

In Count III Plaintiffs allege, upon information and belief, that members of a mutual association have a common law right to vote in person, by mail, or by proxy, on a plan to convert the association from mutual to stock ownership. The Maine Legislature enacted a statute prescribing the method in which voting on a plan of conversion will be conducted. In 1986 when the Peoples Heritage conversion was subjected to a vote of its members, the statute provided:

> Voting on the conversion plan may be in person or by written ballot. Any members or eligible account holders not present at the meeting in person or any member or eligible account holder not returning a written ballot shall be regarded as having affirmatively voted for the conversion and shall be counted among the required ⅔ vote; provided that notice of this fact shall have been contained in the published and mailed notices; and provided further that the notice, along with a ballot, was mailed to the member or eligible account holder as required in section 353, subsection 3, paragraph A.

9–B M.R.S.A. § 344(3). Although the complaint repeatedly refers to a 1982 amendment of the voting statute which did not allow voting by mail and presumed that all account holders not present at the special meeting would be regarded as having affirmatively voted for the conversion, that amendment was not in effect at the time of the Peoples Heritage conversion. The complaint acknowledges that "[i]n 1985 the unfairness of the provision was partially corrected so as to allow submission of written ballots."

Plaintiffs allege that the presumed voting provision (1) bears no rational relation to any legitimate state purpose; (2) fails to promote a compelling state interest; (3) denies equal protection to similarly situated classes of eligible account holders in that the statute imposes greater burdens on those who would vote against the Plan than those who favored the Plan; (4) denies account holders procedural due process; and (5) substantially impairs the charter-based contract rights of account holders to vote on a plan and prevent its passage absent a two-thirds majority of all eligible account holders.

 As Defendants point out, the conversion voting statute is cloaked with a heavy presumption of constitutionality. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973). Moreover, at the outset, it is plain that the statute bears a rational relation to a legitimate state purpose.[10] The state obviously wishes to permit conversions, as long as they are conducted in an equitable manner. The state also wants to assure that conversions are accomplished only with the approval of the account holders of the converting institution. Since the number of account holders is huge, the approval process must take place in a manner that can accommodate all of them. By allowing voting by mail or in person, the statute provides easy voting access to all account holders. The Legislature has determined that a conversion, equitably accomplished, is permissible, and any conversion plan submitted to account holders for approval has already been approved and determined to be equitable by the Superintendent. Therefore, given that the statute also requires notification of the presumption, it is perfectly rational to presume that persons not submitting ballots or appearing at a meeting to vote wish to vote in favor of the conversion or, at the least, are not opposed to it. *See Brundage v. Deardorf,* 92 F. 214, 222 (6th Cir.1899)

---

**10.** The Court can find no constitutional basis for Plaintiff's suggestion that the state must show a compelling state purpose to justify the statute. As discussed previously, this is economic regulation and therefore generally subject to minimal scrutiny.

(Context can "justify the presumption that those who neither voted nor petitioned against these revisions intended thereby to indicate their acceptance of the action of those who did vote.")

■ Defendants argue, and the Court agrees, that there is no equal protection claim stated by the complaint. Assuming that the statute sets up the alleged discrimination between those who would vote in favor of the conversion and those who would vote against, the Court, as discussed above, can find a rational basis for that distinction. *See* discussion *supra.* Clearly, in order to manage a statutorily-required vote of the order of magnitude entailed by a bank conversion,[11] some provision must be made for accounting for those who do not appear or submit a ballot, and the legislative choice to consider those not voting as having voted affirmatively makes sense, as discussed above.

■ Plaintiffs assert that the voting statute as applied to them failed to accord them procedural due process. The classic statement of the requirements of procedural due process is found in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950):

> State action affecting property must generally be accompanied by notification of that action. An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice, reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

Here the challenged statute required mailed notice of the meeting to vote on the conversion, including a description of the presumptive voting provision. The complaint alleges that the bank actually sent the notices to account holders. Moreover, as also required by statute, the mailing included a ballot, providing account holders with the opportunity to vote by ballot if they did not wish to attend the meeting. Providing for both actual notice to account holders and an opportunity for those ac-

count holders to be heard, the statute clearly meets the standards of procedural due process. The record also shows that Peoples Heritage complied with the statute.

Finally, Plaintiffs have alleged that the presumed voting provision violates the Contracts Clause of the Constitution because it substantially impairs the charter-based contract rights of account holders to vote on a plan and prevent its passage absent a two-thirds majority of all eligible account holders. Defendants argue that Plaintiffs have not met the requirements necessary to state a claim under the Contracts Clause as they are set forth in *Keystone Bituminous Coal Association v. DeBenedictis,* 480 U.S. 470, 502–06, 107 S.Ct. 1232, 1251–53, 94 L.Ed.2d 472 (1987), and *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 410–13, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983).

In *Energy Reserves,* the Supreme Court stated that the threshold inquiry for this type of claim is " 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' " *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704 (*quoting Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)). One important factor in determining the extent of any impairment is whether the industry the complaining party has entered has been regulated in the past, for as the Supreme Court stated in *Veix v. Sixth Ward Building & Loan Association,* 310 U.S. 32, 38, 60 S.Ct. 792, 794–95, 84 L.Ed. 1061 (1940): "When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic."

■ If, as Plaintiffs allege upon information and belief, there exists a charter-based contractual right in depositors to a certain voting procedure before change of a bank's form of ownership, that right was rooted in the power of the legislature, which granted the charter. As the Law Court made clear in *Craughwell,* "the state has *ever* found it expedient" to closely regulate banks to protect the public. *Craugh-*

---

**11.** Peoples Heritage had approximately 119,000 account holders entitled to vote.

*well v. Mousam River Trust Co.*, 113 Me. at 534, 95 A. 221. Thus, even if the contract right exists, it is impaired only in the most minimal sense by the newly enacted statute because depositors had no reasonable expectation that the state would not change the rules governing banks and the way in which they might change form of ownership. *See Energy Reserves*, 459 U.S. at 416, 103 S.Ct. at 707. To the extent, if any, that the voting statute impairs any contractual right of the plaintiffs, it is, as discussed previously, prompted by a significant and legitimate state interest, and accomplishes the regulatory goal in a reasonable manner. *See id.* at 417, 103 S.Ct. at 707.[12] The Court finds, therefore, that Plaintiffs have not stated a constitutional claim concerning the presumptive voting statute.[13]

Accordingly, it is ORDERED that Defendants' Motion for Summary Judgment on Count I, be and it is hereby, DENIED. It is FURTHER ORDERED that Defendants' Motion for Summary Judgment on Counts II and III be, and it is hereby, GRANTED.

SO ORDERED.

**12.** The Court notes that Plaintiffs apparently are not serious in advancing this Contracts Clause claim. In response to Defendants' somewhat spare argument on the point, Plaintiffs merely reply, without citation to authority, "[c]ertainly the provision and its application impaired contract rights." The Court finds distressing such a cavalier approach to briefing on a serious matter.

**13.** Defendants have noted a possible standing problem for Plaintiffs regarding Count III. Since the Court has addressed the merits of Plaintiffs' claims, it will not address this issue.